**WHKA FM 87.7 Inc.**
1206 Storrs Road No. 300
Storrs-Mansfield, CT 06268

(860) 341-1731
hackerairwaves@gmail.com

June 22nd 2026



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUME ACIRCUIT



JUN 24 2026

**RECEIVED**

**TO: Clerk, District of Columbia Circuit**
UNITED STATES COURT OF APPEALS

**FROM: Patrick Boots, Director**
WHKA FM 87.7 INC.

**ATTN:** Agency Appellate Intake

**RE:** Notice of Appeal, WHKA FM 87.7 Inc. vs. Federal Communications Commission

## Comments

Dear Clerk,

Please find enclosed the **Notice of Appeal** seeking judicial review of the Commission's Memorandum Opinion and Order, *In the matter of WHKA FM 87.7 Inc.* (Order) (FCC 26-36 - May 20th 2026)

This order unjustly affirmed the dismissal of an application to provide noncommercial radio service in Connecticut operating on FM channel 199 (87.7 MHz) by WHKA FM 87.7 Inc. (WHKA)

As a courtesy for the Court's convenience and records, attached are <u>two</u> binder-clipped packages:

1.  The first contains *one* loose paper-clipped copy and *six* stapled copies of the appeal, and

2.  The second is a courtesy package containing a reference copy of the following:
    -   WHKA's original LPFM application and its attachments, including its comprehensive technical exhibit, educational purpose statement, and requests for waiver of rule,
    -   WHKA's subsequent pleadings and the FCC's responses thereto, and,
    -   The order being appealed and contested here.

WHKA appreciates the Court and its time and consideration regarding this matter.

Thank you.

**SENT VIA:** Certified Mail

# *BEFORE THE*
# UNITED STATES COURT OF APPEALS

**District of Columbia Circuit**



In the matter of:

WHKA FM 87.7 Inc., Appellant vs.
Federal Communications Commission, Respondent

JUN 24 2026

## NOTICE OF APPEAL RECEIVED

Appellant WHKA FM 87.7 Inc. (WHKA) here respectfully appeals to the United States Court of Appeals for the District of Columbia Circuit for review of the Federal Communications Commission's Order(s) concerning WHKA's broadcast application(s)[1], pursuant to 47 USC 402 and Federal Rule of Appellate Procedure 15.

## *Proceedings*

1. WHKA timely filed an application for a new Low Power FM (LPFM) facility within the Commission's Third-Generation LPFM Filing Window[2] to provide noncommercial radio service in Connecticut.[3]

2. Due to the apparent unavailability of so-called "traditional" frequencies for new LPFM service, WHKA simultaneously requested a waiver of rule to operate on FM channel 199 (87.7 MHz) or "FM 87.7."[4] The Commission has previously authorized dozens of radio facilities on FM 87.7 and on similar frequencies.[5]

3. On March 10th 2025, the Commission's Media Bureau dismissed the application and denied the waiver request, erroneously concluding that WHKA "had not established special circumstances that would warrant a deviation from the Commission's fundamental frequency allocation framework."[6]

4. WHKA thereafter timely filed a Petition for Reconsideration demonstrating that the Bureau's decision conflicted with Commission precedent and existing radio operations on FM 87.7, and is inconsistent with the public interest objectives underlying both the Communications Act of 1934 and the LPFM service.[7]

5. On May 23rd 2025, the Bureau denied reconsideration and affirmed dismissal of the application. The Denial Letter failed to meaningfully engage with the questions of fact presented in the Petition for Reconsideration.

6. Pursuant to our right under the law[8], WHKA then filed an Application for Review requesting evaluation of the case by the full Commission, including a reply to the Denial Letter and alternative resolution proposals.[9]

---

[1] *In the matter of WHKA FM 87.7 Inc.*, Memorandum Opinion and Order (Order) (FCC 26-36 - May 20th 2026)

[2] See: 2023 LPFM Filing Window Notice and Extension

[3] New LPFM, Storrs-Mansfield, CT (Application) (Facility No. 788033 and Application File No. 233185)

[4] See: Waiver Request and, generally, *Northeast Cellular Telephone Co. vs. FCC* (897 F 2d 1164 - 1990) (Northeast Telephone Case) ("Waiver is appropriate...[if] such deviation better serves the public interest.")

[5] See: Petition at pg. 3, and generally, FM6 Fifth Report and Order and 47 CFR 73.512(a)(2)

[6] Dismissal Letter at pg. 3

[7] See: Petition for Reconsideration (Petition)

7. On May 19th 2026, the Commission released the Memorandum Opinion and Order, impertinently denying the Application for Review and affirming the dismissal of WHKA's LPFM application. The order disregarded the evidence and issues presented by WHKA in its pleadings. Public notice was issued on May 20th 2026.[10]

8. WHKA is adversely affected and aggrieved by that order and seeks judicial review and resolution thereof.

## *Reasoning*

1. The Commission erred in concluding that WHKA failed to demonstrate "special circumstances" warranting waiver of the rules, and attempts to diminish the significant burdens involved in applying for a new facility.

2. The Commission erred in concluding that WHKA's waiver requests would "alter fundamental components of broadly applicable regulatory schemes" since the Commission has already implemented similar service-specific authorizations when the public interest would be so served.

3. The Commission erred in concluding that consideration of WHKA's proposal could occur only through a rulemaking proceeding and not through the Commission's established waiver authority. The Commission may waive *any* rule if there is good cause to do so and when the application of the rule would be inequitable, unnecessary, or contrary to the public interest.[11] The waiver standard is not "pick from these options."

4. Furthermore, WHKA contends that such rulemaking has already been satisfied via the process that resulted in the FM6 Fifth Report and Order allowing FM 87.7 radio operations.

5. The Commission acted arbitrarily and capriciously by dismissing the significance of spectrum unavailability on the ground that other LPFM applicants may face similar circumstances, rather than evaluating whether the strict application of the rules in this specific case serves the public interest.

6. The Commission erred in concluding that the existence of other radio operations on FM 87.7 and 87.9 could not support waiver relief or otherwise inform the public interest analysis applicable to WHKA's proposal.

7. FM 87.7 radio operations do in fact serve the public interest and are "analogous to ['traditional' FM radio] services"[12] and are technically indistinguishable from other such stations.[13]

8. The Commission erred in imposing a condition that no new applicant could ever satisfy. In a proceeding designed to inaugurate new facilities, denial on the basis that WHKA is not a current licensee is capricious.[14]

---

[8] 47 CFR 1.115(a) et al. ("Any person aggrieved by any action taken pursuant to delegated authority may file an application requesting review of that action by the [full] Commission.")

[9] See: Application for Review (Review)

[10] 47 CFR 1.4(b)(2) (For non-rulemaking documents, the "first day counted" is the *day after* the document's release date)

[11] 47 CFR 1.3 ("*Any* provision of the rules may be waived by the Commission on its own motion or on petition if good cause therefor is shown.") and see Northeast Telephone Case and *WAIT Radio vs. FCC* (418 F 2d 1153 - 1969) (WAIT Radio Case) ("That an agency may discharge its responsibilities by promulgating rules of general application...does not relieve it of an obligation to seek out the public interest in particular, individualized cases.") (emphasis added)

[12] FM6 Fifth Report and Order at par. 39 from FM6 Fifth Notice of Proposed Rulemaking at par. 25

[13] FM6 Fifth Report and Order at par. 55 ("As a practical matter, we agree that listeners are not necessarily able to distinguish between an FM6 LPTV station's FM operations and a traditional FM station.")

9. The Commission's definition of "FM broadcast band" is already not conclusive as written and is itself inconsistent with precedent and the law.[15]

10. By authorizing a "hybrid" technical approach for FM6, the Commission was effectuating new FM 87.7 radio operations, not "grandfathering" existing services.[15]

11. The Commission erred in rejecting WHKA's arguments concerning the legal status and regulatory treatment of FM 87.7, and in failing to adequately address the authorities cited by WHKA regarding the same.[16]

12. The Commission acted arbitrarily and capriciously by characterizing WHKA's request as a request for a new service generally available to all applicants, rather than evaluating the specific facts, circumstances, and technical showing presented by WHKA. Importantly, the proposed station is distinct because FM channel 199 was applied for in the original application, not at some other juncture.

13. The Commission erred by disregarding WHKA's arguments concerning the legal validity of treaty-derived restrictions incorporated into the Commission's rules. WHKA specifically demonstrated that they no longer reflect current law and policy.[17] Rather than address those arguments, the Commission declined to engage with them, leaving unresolved questions regarding the continued validity and application of the rules.[18]

14. The Commission never found that WHKA's proposed operation would cause harmful interference and instead denied relief based upon generalized policy concerns unrelated to the specific merits of the proposal.

15. The Commission erred in discounting WHKA's coordination with the only potentially affected Channel 6 TV licensee, even though the underlying concern is expressly subject to cure through their consent.

16. The Commission failed to engage meaningfully with material facts, example of precedent, and arguments presented by WHKA in its application, exhibits, and subsequent pleadings.

17. The Commission's findings and conclusions were arbitrary, capricious, an abuse of discretion, unsupported by reasoned decision-making, and otherwise contrary to law.

18. The order largely repeats and adopts prior Bureau conclusions without adequately addressing the questions of law and fact that WHKA presented. As a result, WHKA is left with substantial doubt that the meaningful review contemplated by the rules[8] actually occurred. The order reflects little independent analysis.

19. At no point did WHKA wish to propose operations that would knowingly cause interference or to use an irreceivable frequency. In fact, WHKA has made every effort to be a responsible broadcast applicant.

---

[14] Order at par. 10 ("WHKA *does not meet and could never meet* the primary requirement imposed to avoid interference, which is that the LPTV FM6 station *must already exist* and have an 'established track record'...") and at n. 11 ("Channel 200 is available only for use by *existing* Class D stations...") (emphasis added)

[15] See, generally: Petition at pgs. 4-7

[16] Petition at pg. 7 ("The Commission's prior and current authorizations to use FM channel 200 [87.9 MHz] since 1978, and to use FM channel 199 [87.7 MHz] officially since 2023 therefore 'christens' these two channels as being bona fide frequencies in the FM broadcast band...Furthermore, the FM broadcast band is defined in statute as including both 87.7 and 87.9 MHz and the LCRA does not specify or prohibit a specific spectrum range...") (internal citations omitted)

[17] See: Petition at pgs. 5 and 6 and Review at pgs. 7 and 8

[18] See: *Motor Vehicle Manufacturers Association vs. State Farm* (463 US 29 - 1983) (finding agency action is arbitrary and capricious if it fails to account for changed circumstances or lacks a reasoned explanation)

20. The LCRA ensures that LPFM and FM translator stations "remain equal in status"[19] and since a noncommercial FM translator station operates on a so-called alternate channel, a similarly-situated LPFM station (or application for a new station) should not be precluded from doing the same.[20]

21. The Commission erred in its conclusion that manufactured differences in "classes" of broadcast station should justify the dismissal of WHKA's application, in a proceeding designed to inaugurate new stations.

22. The Commission failed to respond to or acknowledge WHKA's proposed alternative resolution(s), which themselves would serve the public interest and independently align with precedent and other services.[21]

23. The LCRA also mandates that the Commission, when considering licensing new LPFM stations, "ensure that...licenses are available...[and] such decisions are made based on the needs of the local community."[22]

24. The LPFM service was "designed to be simple so that nonprofit organizations with limited engineering expertise and small budgets could readily apply,"[23] yet, the Commission's application of the rules in this proceeding has imposed barriers wildly inconsistent with that, and other, objectives of the LPFM service.

25. The Commission's licensing framework already imposes substantial technical, procedural, and regulatory burdens on applicants seeking to establish new broadcast facilities. WHKA diligently and in good faith complied with those requirements and demonstrated that its operation would serve the public interest.

26. By denying WHKA's application despite the absence of any demonstrated technical impediment to service, the Commission acted arbitrarily and capriciously and frustrated the core purpose of the LPFM service: to expand local, noncommercial voices in communities underserved by other media outlets.[24]

27. The Commission erred in concluding that "The PIRATE Act defines what constitutes pirate radio broadcasting, not FM radio broadcasting,"[25] since "pirate (illegal) broadcasting" is married to the concept of "licensed (legal) broadcasting." Further, that act was codified in statute, which supersedes agency rules.

28. The Commission declined to address issues raised by WHKA while simultaneously relying upon those unresolved issues to justify dismissal. Further, the agency failed to articulate adequate and reasoned explanations for many of its decisions and, in doing so, invited unnecessary public scrutiny of WHKA.

To the extent consistent with this Appeal, WHKA incorporates by reference the arguments, authorities, factual showings, proposals, and demonstrations included in our application and pleadings filed with the Commission.

---

[19] Petition at pg. 6, citing LCRA at sec. 5(3)

[20] Petition at pg. 6, citing LPFM Fourth Report and Order and LPFM Third Further Notice

[21] Review at pg. 10

[22] LCRA at sec. 5(2)

[23] *Amendments of Parts 73 and 74 to Improve the Lower Power FM Technical* Rules, Notice of Proposed Rulemaking (Docket No. 19-193 - FCC 19-74 - July 2019) (LPFM Technical Order) at par. 2, citing Creation *of a Low Power Radio Service*, Report and Order (Docket No. 99-25 - FCC 00-19 - January 2000) (LPFM Report and Order) at par. 4

[24] See, eg.: LPFM Report and Order at par. 4 ("Our goal in creating a new LPFM service is to create a class of radio stations designed to serve very localized communities or underrepresented groups within communities.")

[25] Order at par. 12, citing Review at pg. 4, citing the PIRATE Act as codified at 47 USC 511 ("[FM] spectrum frequencies between...87.7 and 108 megahertz, inclusive")

## Standing

WHKA has standing to bring forth this Appeal, pursuant to the Commission's own regulations and the Administrative Procedures Act, which provide that "appeals may be taken from decisions and orders of the Commission...by any applicant for a construction permit or station license, whose application is denied."[26]

This notice is timely filed, as it is within June 22nd 2026, 30 days after public notice of the contested decision.[27]

## Resolution

Appellant WHKA FM 87.7 Inc. respectfully requests that this Court accept the following resolution:

- Grant this Appeal,

- Vacate the Commission's Memorandum Opinion and Order,

- Reverse the decisions rendered by the Commission denying WHKA's application and pleadings,

- Remand this matter to the Commission for further processing consistent with the Court's decision,

- Put into force the acceptance of WHKA's proposal for a noncommercial Channel 6 TV facility alongside an FM6 radio operation, waiving prohibitive rules as such[28], and,

- Grant such other and further relief as the Court deems just and proper.

## Conclusion

There is ample and compelling reasoning, with good cause shown herein, to allow WHKA to operate a new noncommercial FM 87.7 radio facility as one that serves the public interest, convenience, and necessity.

WHKA presented a technically sound proposal for a new broadcast facility operating on FM 87.7 and proposed reasonable alternatives consistent with existing Commission policy. The Commission nevertheless declined to meaningfully engage with those showings and denied relief without showing any actual impediment to service. The Order should therefore be vacated, the prior decisions reversed, and the proposed FM6 resolution accepted.

Respectfully submitted,

Patrick Boots
Director, WHKA FM 87.7 Inc.

---

[26] 47 USC 402(b) et al.

[27] Federal Rule of Appellate Procedure 26(a)(1)(c) (The original filing deadline fell on June 19th 2026, Juneteenth National Independence Day, a federal legal holiday. Accordingly, the deadline extended to the next business day.)

[28] WHKA originally proposed an "FM6" LPTV operation as an alternative remedy, but the Commission never meaningfully addressed that proposal. With the LPTV filing freeze now lifted, there is little apparent justification for refusing to consider an FM6 facility, which would advance the public interest and WHKA's original objectives.

See also: Media Bureau Announces a Phased Resumption of First-Come, First-Served Processing of Applications for Major Changes for Class A, LPTV, and TV Translator Stations and Applications for New LPTV and TV Translator Stations (DA 25-792 - September 3rd 2025) et seq.

# CERTIFICATE OF SERVICE

I, Patrick Boots, on behalf of WHKA FM 87.7 Inc., hereby certify that on this 22nd day of June, 2026, I caused a true and correct copy of the foregoing Notice of Appeal to be forwarded by United States Certified Mail and served upon receipt to the following:

Office of General Counsel
Federal Communications Commission
45 L Street Northeast
Washington, DC 20554

Ms. Christine Goepp, Attorney for the Audio Division, Media Bureau
Mr. Alexander Sanjenis, Office of the Bureau Chief, Media Bureau
Federal Communications Commission

I further certify that the foregoing Notice of Appeal was filed with the United States Court of Appeals for the District of Columbia Circuit in accordance with applicable law and court rules.

Respectfully submitted,

Patrick Boots
Director, WHKA FM 87.7 Inc.

Approved by OMB (Office of Management and Budget) 3060-0027
September 2014

 Federal
Communications
Commission

## (REFERENCE COPY - Not for submission)
## New Low Power FM Station Construction Permit Application

File Number: **0000233185**   Submit Date: **12/15/2023**   Lead Call Sign: **NEW**   Facility ID: **788033**

FRN: **0029921855**

Service: **Low Power FM**   Purpose: **Construction Permit**   Status: **Pending**   Status Date: **12/15/2023**   Filing Status: **Active**

## General Information

| Section | Question | Response |
|---|---|---|
| **Attachments** | Are attachments (other than associated schedules) being filed with this application? | Yes |

## Fees, Waivers, and Exemptions

| Section | Question | Response |
|---|---|---|
| **Waivers** | Does this filing request a waiver of the Commission's rule (s)? | Yes |
| | Total number of rule sections involved in this waiver request: | 7 |

## Applicant Information

### Applicant Name, Type, and Contact Information

| Applicant | Address | Phone | Email | Applicant Type |
|---|---|---|---|---|
| **WHKA FM 87.7 Inc.** | 1206 Storrs Road No. 300 Storrs-Mansfield, CT 06268 United States | +1 (860) 341-1731 | hackerairwaves@gmail.com | NFP |

## Contact Information (1)

| Contact Name | Address | Phone | Email | Contact Type |
|---|---|---|---|---|
| **Patrick Boots** *Director* WHKA FM 87.7 Inc. | Patrick Boots 1206 Storrs Road No. 300 Storrs-Mansfield, CT 06268 United States | +1 (860) 341-1731 | hackerairwaves@gmail.com | Technical Representative |

## Parties to the Application (3)

| Party Name | Address | Phone | Email | Positional Interest |
|---|---|---|---|---|
| **Patrick Boots** *Director* | 1206 Storrs Road No. 300 Storrs-Mansfield, CT 06268 United States | +1 (860) 341-1731 | hackerairwaves@gmail.com | **Positional Interest:** Director **Citizenship:** United States **Percentage of Votes:** 33% **Percentage of Total Assets:** 0% |

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUN 24 2026

 RECEIVED

| | | | | |
|---|---|---|---|---|
| **Alexandra Gillis**<br>*Director* | 1206 Storrs Road No. 300<br>Storrs-Mansfield, CT 06268<br>United States | +1 (860) 341-1731 | hackerairwaves@gmail.com | **Positional Interest:**<br>Director<br>**Citizenship:**<br>United States<br>**Percentage of Votes:**<br>33%<br>**Percentage of Total Assets:**<br>0% |
| **Seamus Boots**<br>*Director* | 1206 Storrs Road No. 300<br>Storrs-Mansfield, CT 06268<br>United States | +1 (860) 341-1731 | hackerairwaves@gmail.com | **Positional Interest:**<br>Director<br>**Citizenship:**<br>United States<br>**Percentage of Votes:**<br>33%<br>**Percentage of Total Assets:**<br>0% |

## Attributable Interest

| Section | Question | Response |
|---|---|---|
| **Equity and Financial Interests** | Applicant certifies that equity and financial interests not listed in the Parties to the Application section are non-attributable pursuant to the notes to 47 C.F.R. Section 73.3555. | Yes |

## Alien Ownership

| Question | Response |
|---|---|
| **1)** Is the applicant a foreign government or the representative of any foreign government as specified in Section 310(a) of the Communications Act? | No |
| **2)** Is the applicant an alien or the representative of an alien? (Section 310(b)(1)) | No |
| **3)** Is the applicant a corporation, or non-corporate entity, that is organized under the laws of any foreign government? (Section 310(b)(2)) | No |
| **4)** Is the applicant an entity of which more than one-fifth of the capital stock, or other equity or voting interest, is owned of record or voted by aliens or their representatives or by a foreign government or representative thereof or by any entity organized under the laws of a foreign country? (Section 310(b)(3)) | No |
| **5)** Is the applicant directly or indirectly controlled by any other entity of which more than one-fourth of the capital stock, or other equity or voting interest, is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any entity organized under the laws of a foreign country? (Section 310(b)(4)) | No |
| **6)** Has the applicant received a declaratory ruling(s) under Section 310(b)(4) of the Communications Act? | No |
| **6a)** Enter the citation of the applicable declaratory ruling by DA/FCC number or the FCC Record citation, release date, or any other identifying information. | |
| **7)** Has there been any change in the applicant's foreign ownership since issuance of the declaratory ruling(s) cited in response to Question 6? | |
| **7a)** Enter the File or Docket Number of the Petition for Declaratory Ruling that the applicant has filed for its foreign ownership in connection with this application pursuant to Section 310(b)(4) of the Communications Act. | |
| **8)** Does the applicant certify that it is in compliance with the terms and conditions of the foreign ownership declaratory ruling(s) cited in response to Question 6? | |
| **9)** In connection with this application, is the applicant filing a foreign ownership Petition for Declaratory Ruling pursuant to Section 310(b)(4) of the Communications Act? | No |

# Legal Certifications

| Section | Question | Response |
|---|---|---|
| **Eligibility Certifications** | The applicant certifies that it is a: | Nonprofit educational institution |
| | If the answer is "Yes" and the applicant is submitting multiple applications, is this application the "priority" application? See Creation of a Low Power Radio Service, Memorandum Opinion and Order on Reconsideration, 15 FCC Rcd 19208, 19239-40, 79-80, paras. 79-80 (2000). | |
| **Community-Based Criteria** | Applicants must certify that they are local to be eligible for LPFM authorizations. An applicant must select "yes" to at least one of the certifications below to be eligible for an LPFM license. The applicant certifies that: | |
| | It is a nonprofit educational institution or organization that is physically headquartered or has a campus within 16.1 kilometers (10 miles), if applicant is in the top 50 urban markets, or 32.1 kilometers (20 miles) if applicant is outside the top 50 urban markets, of the proposed transmitting antenna site set forth in this application | Yes |
| | It is a nonprofit educational institution or organization that has 75 percent of its board members residing within 16.1 kilometers (10 miles), if applicant is in the top 50 urban markets, or 32.1 kilometers (20 miles) if applicant is outside the top 50 urban markets, of the proposed transmitting antenna site set forth in this application | Yes |
| | It is a Tribe and its Tribal Lands, as that term is defined in Section 73.7000 of the Commission's rules, are within the service area of the proposed LPFM station; or it is a Tribal organization owned or controlled by a Tribe (or Tribes) and such Tribe's (or Tribes') Tribal Lands, as that term is defined in Section 73.7000 of the Commission's rules, are within the service area of the proposed LPFM station. See 47 C.F.R. Sections 73.853(c) and 73.7000. | No |
| | It proposes a public safety radio service and has jurisdiction within the service area of the proposed LPFM station. | No |
| **Ownership** | The applicant certifies that: | |
| | No party to this application has an attributable interest in any low power FM broadcast station | Yes |
| | No party to this application has an attributable interest in any non-LPFM broadcast station, including any full power AM or FM station, FM translator station, full or low power television station, or any other media subject to the Commission's broadcast ownership restrictions | Yes |
| | No party to this application has pending an application for a low power FM, full power AM or FM station, FM translator station, or full or low power television station; | Yes |
| | The applicant is in compliance with the Commission's policies relating to media interests of immediate family members; and | Yes |
| | The applicant is in compliance with the Commission's policies relating to investor insulation and the non-participation of non-party investors and creditors. | Yes |

| | | |
|---|---|---|
| **Character Issues** | Applicant certifies that neither the applicant nor any party to the application has or had any interest in, or connection with:<br><br>(a) any broadcast application in any proceeding where character issues were left unresolved or were resolved adversely against the applicant or party to the application; or<br><br>(b) any pending broadcast application in which character issues have been raised. | Yes |
| **Adverse Findings** | Applicant certifies that, with respect to the applicant and any party to the application, no adverse finding has been made, nor has an adverse final action been taken by any court or administrative body in a civil or criminal proceeding brought under the provisions of any laws related to any of the following: any felony; mass media-related antitrust or unfair competition; fraudulent statements to another governmental unit; or discrimination. | Yes |
| **Unlicensed Operation** | The applicant certifies, under penalty of perjury, that neither the applicant nor any party to the application has engaged in any manner, individually or with other persons, groups, organizations, or other entities, in the unlicensed operation of any station in violation of Section 301 of the Communications Act of 1934, as amended, 47 U.S.C. Section 301. | Yes |

## Point System Factors

New station and major change LPFM applicants must complete the following questions. Point system factors are used only for selection among mutually exclusive applications for new LPFM stations and major modifications of authorized LPFM stations. Mutually exclusive applicants will be awarded one point for each of the following:

| Section | Question | Response |
|---|---|---|
| **Established Community Presence** | The applicant certifies that it is a: | N/A |
| **Local Program Origination** | The applicant pledges to originate locally at least eight hours of programming per day. | Yes |
| **Main Studio** | The applicant pledges to maintain a publicly accessible main studio that has local program origination capability, is reachable by telephone, is staffed at least 20 hours per week between 7 a.m. and 10 p.m., and is located within 16.1 kilometers (10 miles) of the proposed site for the transmitting antenna for applicants in the top 50 urban markets and 32.1 kilometers (20 miles) for applicants outside the top 50 urban markets. | Yes |
| | An applicant claiming a point under the main studio criterion must provide the proposed address and telephone number for the main studio. | Future Development |
| | Address Line 1: | |
| | Address Line 1: | |
| | City: | Storrs-Mansfield |
| | State: | CT |
| | Zip Code: | 06268 |
| | Phone: | (860) 341-1731 |
| **Local Program Origination and Main Studio** | The applicant certifies that it qualifies for a point under both the local program origination and the main studio criteria. | Yes |
| **Diversity of Ownership** | The applicant certifies that neither it nor any party to the application holds an attributable interest in any other broadcast station. | Yes |

| Section | Question | Response |
|---|---|---|
| Tribes or Tribal Organizations | The applicant certifies it is a Tribe proposing to locate its transmitting antenna site on its Tribal Lands, or a Tribal organization proposing to locate its transmitting antenna site on the Tribal Lands of the Tribe or Tribes that own or control more than 51 percent of the organization. | No |

## Involuntary Time-Share Information

New station and major change applicants must complete the following questions.

This information will be used only for selection among mutually exclusive applications for the new LPFM stations and major modification of authorized LPFM stations and only in the event that two or more applications are tied after the point system analysis. See 47 C.F.R. Section 73.872

| Section | Question | Response |
|---|---|---|
| Established Community Presence | Provide the date on which the applicant qualified as local. See 47 C.F.R. Section 73.853(b). | 11/01/2023 |
| | Applicant certifies that it has remained local at all times since this date. | Yes |

## Channel and Facility Information

| Section | Question | Response |
|---|---|---|
| Proposed Community of License | State | Connecticut |
| | City | STORRS MANSFIELD |
| | Channel | ~~204~~ 199 |
| | Frequency | ~~88.1~~ 87.7 MHz |

## Antenna Location Data

| Section | Question | Response |
|---|---|---|
| Antenna Structure Registration | Do you have an FCC Antenna Structure Registration (ASR) Number? | Yes |
| | ASR Number | 1240431 |
| Coordinates (NAD83) | Latitude | 41° 47' 04.4" N+ |
| | Longitude | 072° 08' 08.6" W- |
| | Structure Type | TOWER-A free standing or guyed struct |
| | Overall Structure Height | 44.81 meters |
| | Support Structure Height | 44.8 meters |
| | Ground Elevation (AMSL) | 153.12 meters |
| Antenna Data | Height of Radiation Center Above Ground Level | Horizontal:22 meters Vertical:22 meters |
| | Height of Radiation Center Above Mean Sea Level | Horizontal:175.12 meters Vertical:175.12 meters |
| | Minimum Effective Radiated Power | Horizontal: 50.0 W Vertical: 50.0 W |
| | Maximum Effective Radiated Power | Horizontal: 100.0 W Vertical: 100.0 W |

## Antenna Technical Data

| Section | Question | Response |
|---|---|---|

| Antenna Type | Antenna Type | | Non-Directional |
|---|---|---|---|

### Directional Antenna Relative Field Value

| Degree | Value | Degree | Value | Degree | Value | Degree | Value |
|---|---|---|---|---|---|---|---|

### Additional Azimuths

| Degree | Value |
|---|---|

## Technical Certifications

| Section | Question | Response |
|---|---|---|
| Environmental Effect | Would a Commission grant of Authorization for this location be an action which may have a significant environmental effect? (See 47 C.F.R. Section 1.1306) | No |
| Interference | Does the applicant certify that the proposed facility complies with the engineering requirements of 47 CFR Section 73.807 (a) through (g), and 73.825? | No **See Exhibit** |
| Reasonable Site Assurance | Applicant certifies that it has reasonable assurance in good faith that the site or proposed structure at the location of its transmitting antenna will be available to the applicant for the applicant's intended purpose. | Yes |
| | If reasonable assurance is not based on applicant's ownership of the proposed site or structure, applicant certifies that it has obtained such reasonable assurance by contacting the owner or person possessing control of the site or structure. | Yes |
| | Name of the person contacted | Ben Gleason |
| | Phone number of the person contacted | (781) 428-7346 |
| | Person contacted is | Authorized Representative |

## Certification

| Section | Question | Response |
|---|---|---|
| General Certification Statements | The Applicant waives any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the United States because of the previous use of the same, whether by authorization or otherwise, and requests an Authorization in accordance with this application (See Section 304 of the Communications Act of 1934, as amended.). | |
| | The Applicant certifies that neither the Applicant nor any other party to the application is subject to a denial of Federal benefits pursuant to §5301 of the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 862, because of a conviction for possession or distribution of a controlled substance. This certification does not apply to applications filed in services exempted under §1.2002(c) of the rules, 47 CFR . See §1. 2002(b) of the rules, 47 CFR § 1.2002(b), for the definition of "party to the application" as used in this certification § 1.2002(c). The Applicant certifies that all statements made in this application and in the exhibits, attachments, or documents incorporated by reference are material, are part of this application, and are true, complete, correct, and made in good faith. | |

| Authorized Party to Sign | **FAILURE TO SIGN THIS APPLICATION MAY RESULT IN DISMISSAL OF THE APPLICATION AND FORFEITURE OF ANY FEES PAID** Upon grant of this application, the Authorization Holder may be subject to certain construction or coverage requirements. Failure to meet the construction or coverage requirements will result in automatic cancellation of the Authorization. Consult appropriate FCC regulations to determine the construction or coverage requirements that apply to the type of Authorization requested in this application. WILLFUL FALSE STATEMENTS MADE ON THIS FORM OR ANY ATTACHMENTS ARE PUNISHABLE BY FINE AND/OR IMPRISONMENT (U.S. Code, Title 18, §1001) AND/OR REVOCATION OF ANY STATION AUTHORIZATION (U.S. Code, Title 47, §312(a)(1)), AND /OR FORFEITURE (U.S. Code, Title 47, §503). | |
|---|---|---|
| | I declare, under penalty of perjury, that I am an authorized representative of the above-named applicant for the Authorization(s) specified above. | **Patrick Boots** *Director* 12/15/2023 |

## Attachments

| File Name | Uploaded By | Attachment Type | Description | Upload Status |
|---|---|---|---|---|
| WHKA FM 87.7 - Certificate of Incorporation.pdf | Applicant | Legal Certifications | Certificate of Incorporation | Done with Virus Scan and/or Conversion |
| WHKA FM 87.7 - Comprehensive Technical Exhibit.pdf | Applicant | Technical Certifications | Comprehensive Technical Exhibit | Done with Virus Scan and/or Conversion |
| WHKA FM 87.7 - Educational Purpose Statement.pdf | Applicant | | Educational Purpose Statement | Done with Virus Scan and/or Conversion |
| WHKA FM 87.7 - Requests for Waiver of Rule.pdf | Applicant | Fees, Waivers and Exemptions | Requests for Waiver of Rule | Done with Virus Scan and/or Conversion |

# COMPREHENSIVE TECHNICAL EXHIBIT

## Introduction

The purpose of this application is to propose a new Low Power FM (LPFM) facility to provide noncommercial educational radio service to the Storrs-Mansfield, CT community, operating on FM channel 199 (87.7 MHz).

WHKA FM 87.7 Inc. has prepared this application, including this technical exhibit, in accordance with the Commission's rules and pursuant to Form 2100 - Schedule 318: Application for an LPFM Construction Permit.

## Expanded Technical Parameters

|  |  |
|---|---|
| Class: | LP100 |
| City and State: | Storrs-Mansfield, CT |
| Channel: | **199 (87.7 MHz)** |
| Site Location: | NAD 27 Coordinates: 41° 47' 04.04" N, 72° 08' 10.39" W <br> NAD 83 Coordinates: 41° 47' 04.39" N, 72° 08' 08.66" W <br> Street Address: 123 Palmer Road, Chaplin, CT 06235 |
| Structure Registration: | 1240431 |
| Overall Structure Height: | 44.8 meters (148 feet) |
| Site Elevation: | 153 meters |
| Site Average Terrain: | 8 meters |

*Height of Antenna Radiation Center:*

|  |  |
|---|---|
| Above Ground Level: | 22 meters |
| Above Mean Sea Level: | 175 meters |
| Above Average Terrain: | 30 meters |

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUN 24 2026

RECEIVED

*Effective Radiated Power (ERP):*

|  |  |
|---|---|
| Maximum LPFM ERP: | 100 watts at 30 meters HAAT |
| Proposed ERP: | 100 watts |

*Proposed Antenna Information:*

|  |  |
|---|---|
| Make and Model: | Shively Labs 6812B *or equivalent* |
| Type: | Omnidirectional |
| Number of Elements: | Two (2) bays |
| Polarization Pattern: | Circular |

*Proposed Filtering System Information:*

|  |  |
|---|---|
| Make and Model: | Nicom FBP 800 *or equivalent* |
| Type: | Bandpass cavity filter |
| Bandwidth: | 800 kHz typical |

# Interference Particulars

## Channel 6 TV Stations

| Callsign | Facility No. | Channel | Status | City and State | ERP kW | HAAT m | Distance km |
|---|---|---|---|---|---|---|---|
| WVCC | 186686 | 6 | LIC | Westmoreland, NH | 3 H | 277 | 95.38 |

- **See statement from WVCC legal representative**

| Callsign | Facility No. | Channel | Status | City and State | ERP kW | HAAT m | Distance km |
|---|---|---|---|---|---|---|---|
| WNYZ | 56043 | FM6 | LIC | New York, NY | 3 | 200 | 190.29 |

- The requested facility is sufficiently distant from WNYZ, satisfying both 73.825(b) and 74.1205.

## First-Adjacent Stations (87.9 MHz)

| Callsign | Facility No. | Channel | Status | City and State | ERP kW | HAAT m | Distance km |
|---|---|---|---|---|---|---|---|
| K200AA | 83363 | 200 | APP | Sun Valley, NV | 0.25 | 144.4 H | 3974.32 |

- The proposed site greatly exceeds the distance of 28 km for first-adjacent translators in 73.807(c).

## Second-Adjacent Stations (88.1 MHz)

| Callsign | Facility No. | Channel | Status | City and State | ERP kW | HAAT m | Distance km |
|---|---|---|---|---|---|---|---|
| WKIV | 84180 | 201 | LIC | Westerly, RI | 1 | 64 | 50.06 |
| WESU | 71537 | 201 | LIC | Middletown, CT | 6 | 11 | 50.47 |

- The proposed site exceeds the distance of 29 km for second-adjacent Class A stations in 73.807(a).

## Third-Adjacent Stations (88.3 MHz)

No third-adjacent stations within 100 km of the proposed site operate radio reading services on a subcarrier according to the Massachusetts Talking Information Center and the Rhode Island Association for the Blind.

## Translator and Booster Input

There are no FM boosters within 20 km of the proposed site.

| Callsign | Facility No. | Channel | Status | City and State | ERP kW | HAAT m | Distance km |
|---|---|---|---|---|---|---|---|
| W258AC | 13611 | 258 | LIC | Storrs-Mansfield, CT | 0.01 | 117 | 10.8 |

- W258AC translates WNPR FM 90.5 Meriden, CT (Facility No. 13627) directly off-the-air.
- WNPR is fourteen channels adjacent to the proposed station and 64 km distant.

| Callsign | Facility No. | Channel | Status | City and State | ERP kW | HAAT m | Distance km |
|---|---|---|---|---|---|---|---|
| W237EL | 140714 | 237 | LIC | Willimantic, CT | 0.005 | 0 | 13.04 |

- W237EL translates WILI AM 1400 Willimantic, CT (Facility No. 66180) using other methods.
- Interference to the translator input from the proposed station is not possible.

| Callsign | Facility No. | Channel | Status | City and State | ERP kW | HAAT m | Distance km |
|---|---|---|---|---|---|---|---|
| W269ED | 155793 | 269 | LIC | Montville, CT | 0.25 | 193.3 H | 15.42 |

- W269ED translates WBMW FM 106.5 Pawcatuck, CT (Facility No. 55404) using an internet webcast.
- Interference to the translator input from the proposed station is not possible.

# Environmental Compliance

The requested facility will not have a significant environmental impact and complies with the provisions of 1.1307(a). The addition of the proposed antenna will not increase the tower height, the tower in question does not have intense lighting, nor does it affect wildlife preserves, historic places, indigenous sites, or otherwise.

An environmental assessment is not necessary.

## RF Exposure

The FM Model web software was used to estimate the potential level of RF exposure at the proposed site, utilizing the specifications of OET Bulletin 65 and 65 Supplement A (*Evaluating Compliance with FCC Guidelines for Human Exposure to Radiofrequency Electromagnetic Fields*) as well as the standards of ANSI-IEEE C95.1.



|  |  |
|---|---|
| Model Antenna Type: | EPA Type 1 |
| Number of Elements: | Two (2) bays |
| Element Spacing: | One (1) wavelength |
| Measuring Distance: | 500 meters |
| Height Above Ground Level: | 22 meters |
| Horizontal ERP: | 100 watts |
| Vertical ERP: | 100 watts |

The result using the worst-case model antenna type determined that the highest value of power density occurs at 5 meters from the base of the tower and is 10.07 uW/cm$^2$. This calculated figure is 5% of the 200 uW/cm$^2$ maximum permissible exposure limit for casual-uncontrolled exposure outlined in 1.1307(b) and 1.1310(e)(1).

Taking into account active emissions, the anticipated total site power density is compliant at 30% of the limit.

Additionally, the proposed antenna is located at least 22 meters above ground level, satisfying the simplified requirement of Schedule 318 Worksheet 3 for single LPFM stations on a tower that supports other RF sources.

## International Coordination

The proposed facility satisfies the provisions of 73.807(g) with respect to international considerations.

- The distance to the nearest point along the US-Canada border is 359 km.
- The distance to the nearest point along the US-Mexico border is 2642 km.

Additionally, the 34 dBu interference contour does not cross the US-Canada border, meeting the requirements for LPFM stations of Section 4.4 of the *February 1991 Working FM Agreement with Canada*, as amended.

Furthermore, the proposed station exceeds the required distances for low-band VHF co-channel protection outlined in Annex 4 Table 1 of the *November 1993 Working TV Agreement with Canada*.

## Research and Receiving Coordination

The proposed site meets all requirements of 73.1030.

It is far outside of the National Radio Astronomy Quiet Zone, Table Mountain Receiving Zone, and Arecibo Observatory Notification Zone. As well, the nearest protected monitoring station is 386 km distant in Belfast, Maine - well beyond any potential 80 dBu contour.

## Attachments

- Projected 60 dBu 50-50 Service Contour
- Aerial Photo of Proposed Site
- American Tower Site Assurance Letter
- Shively Labs 6812B Antenna Information

- *Educational Purpose Statement*
- *Requests for Waiver of Rule*
- *WHKA FM 87.7 Inc. Certificate of Incorporation*



## Aerial Photo of Proposed Site



Imagery ©2023 Maxar Technologies



**AMERICAN TOWER®**
CORPORATION

November 28th 2023
WHKA FM 87.7 Inc.
Patrick Boots

Dear Mr. Boots,

American Tower Corporation hereby grants WHKA FM permission to represent in any applications filed with the Federal Communications Commission ("FCC") that the company has reasonable assurance from American Tower that it will enter into good faith lease negotiations for tower and transmission equipment space. Final consideration shall be contingent upon submitting a completed site application, receiving credit approval from American Tower and conducting a full structural analysis and shared interference study.

Once you receive a valid construction permit, please contact Benjamin Gleason, Inside Sales Representative at benjamin.gleason@americantower.com or (781) 428-7346 to submit an application and receive a lease quote. We look forward to working with you on the build out of your station.

Thank you for your interest in American Tower.


Regards,


Benjamin Gleason
Inside Sales Representative
(781) 428-7346
Woburn, MA

| | | | | |
|---|---|---|---|---|
| **Antenna Mfg.:** Shively Labs | | | **Date:** 12/5/2023 | |
| **Antenna Type:** 6812-2R | | | | |
| **Station:** WHKA | **Beam Tilt** | 0 | | |
| **Frequency:** 87.7 | **Gain (Max)** | 0.989 | -0.050 dB | |
| **Channel #:** 199 | **Gain (Horizon)** | 0.989 | -0.050 dB | |
| **Figure:** Figure 3 | | | | |



| | | | |
|---|---|---|---|
| **Antenna Mfg.:** Shively Labs | | **Date: 12/5/2023** | |
| **Antenna Type:** 6812-2R | | | |
| **Station:** WHKA | **Beam Tilt** 0 | | |
| **Frequency:** 87.7 | **Gain (Max)** 0.989 | -0.050 dB | |
| **Channel #:** 199 | **Gain (Horizon)** 0.989 | -0.050 dB | |
| **Figure:** Figure 3 | | | |

| Angle of Depression (Deg) | Relative Field | Angle of Depression (Deg) | Relative Field | Angle of Depression (Deg) | Relative Field | Angle of Depression (Deg) | Relative Field |
|---|---|---|---|---|---|---|---|
| -90 | 0.000 | -44 | 0.131 | 0 | 1.000 | 46 | 0.169 |
| -89 | 0.017 | -43 | 0.110 | 1 | 0.999 | 47 | 0.187 |
| -88 | 0.032 | -42 | 0.087 | 2 | 0.996 | 48 | 0.203 |
| -87 | 0.048 | -41 | 0.063 | 3 | 0.990 | 49 | 0.217 |
| -86 | 0.063 | -40 | 0.038 | 4 | 0.982 | 50 | 0.231 |
| -85 | 0.078 | -39 | 0.012 | 5 | 0.972 | 51 | 0.243 |
| -84 | 0.092 | -38 | 0.015 | 6 | 0.960 | 52 | 0.254 |
| -83 | 0.106 | -37 | 0.043 | 7 | 0.946 | 53 | 0.263 |
| -82 | 0.120 | -36 | 0.072 | 8 | 0.930 | 54 | 0.271 |
| -81 | 0.134 | -35 | 0.103 | 9 | 0.912 | 55 | 0.278 |
| -80 | 0.147 | -34 | 0.134 | 10 | 0.892 | 56 | 0.284 |
| -79 | 0.160 | -33 | 0.166 | 11 | 0.871 | 57 | 0.289 |
| -78 | 0.173 | -32 | 0.199 | 12 | 0.848 | 58 | 0.292 |
| -77 | 0.185 | -31 | 0.232 | 13 | 0.823 | 59 | 0.294 |
| -76 | 0.197 | -30 | 0.266 | 14 | 0.796 | 60 | 0.296 |
| -75 | 0.208 | -29 | 0.300 | 15 | 0.769 | 61 | 0.296 |
| -74 | 0.219 | -28 | 0.335 | 16 | 0.740 | 62 | 0.295 |
| -73 | 0.229 | -27 | 0.370 | 17 | 0.709 | 63 | 0.293 |
| -72 | 0.238 | -26 | 0.405 | 18 | 0.678 | 64 | 0.290 |
| -71 | 0.247 | -25 | 0.440 | 19 | 0.646 | 65 | 0.286 |
| -70 | 0.256 | -24 | 0.476 | 20 | 0.613 | 66 | 0.282 |
| -69 | 0.263 | -23 | 0.511 | 21 | 0.579 | 67 | 0.277 |
| -68 | 0.270 | -22 | 0.545 | 22 | 0.545 | 68 | 0.270 |
| -67 | 0.277 | -21 | 0.579 | 23 | 0.511 | 69 | 0.263 |
| -66 | 0.282 | -20 | 0.613 | 24 | 0.476 | 70 | 0.256 |
| -65 | 0.286 | -19 | 0.646 | 25 | 0.440 | 71 | 0.247 |
| -64 | 0.290 | -18 | 0.678 | 26 | 0.405 | 72 | 0.238 |
| -63 | 0.293 | -17 | 0.709 | 27 | 0.370 | 73 | 0.229 |
| -62 | 0.295 | -16 | 0.740 | 28 | 0.335 | 74 | 0.219 |
| -61 | 0.296 | -15 | 0.769 | 29 | 0.300 | 75 | 0.208 |
| -60 | 0.296 | -14 | 0.796 | 30 | 0.266 | 76 | 0.197 |
| -59 | 0.294 | -13 | 0.823 | 31 | 0.232 | 77 | 0.185 |
| -58 | 0.292 | -12 | 0.848 | 32 | 0.199 | 78 | 0.173 |
| -57 | 0.289 | -11 | 0.871 | 33 | 0.166 | 79 | 0.160 |
| -56 | 0.284 | -10 | 0.892 | 34 | 0.134 | 80 | 0.147 |
| -55 | 0.278 | -9 | 0.912 | 35 | 0.103 | 81 | 0.134 |
| -54 | 0.271 | -8 | 0.930 | 36 | 0.072 | 82 | 0.120 |
| -53 | 0.263 | -7 | 0.946 | 37 | 0.043 | 83 | 0.106 |
| -52 | 0.254 | -6 | 0.960 | 38 | 0.015 | 84 | 0.092 |
| -51 | 0.243 | -5 | 0.972 | 39 | 0.012 | 85 | 0.078 |
| -50 | 0.231 | -4 | 0.982 | 40 | 0.038 | 86 | 0.063 |
| -49 | 0.217 | -3 | 0.990 | 41 | 0.063 | 87 | 0.048 |
| -48 | 0.203 | -2 | 0.996 | 42 | 0.087 | 88 | 0.032 |
| -47 | 0.187 | -1 | 0.999 | 43 | 0.110 | 89 | 0.017 |
| -46 | 0.169 | 0 | 1.000 | 44 | 0.131 | 90 | 0.000 |
| -45 | 0.151 | | | 45 | 0.151 | | |

# EDUCATIONAL PURPOSE STATEMENT

## Introduction

WHKA FM 87.7 Inc. is a nonprofit educational organization incorporated in 2023 and organized to provide noncommercial radio broadcasting and webcasting services. We will operate in the public interest with programming that will advance the educational and charitable ideals of the Storrs-Mansfield, CT community.

Our educational mission is to promote 21st century journalism and a diverse dial through broadcasting news and information pertinent to the local population in addition to music and entertainment programming. Over the years, our people have partnered with a wide range of nonprofit organizations, schools, and community media centers in other parts of CT to serve as a model for civic activism and nonpartisan newsgathering.

The proposed Low Power FM radio station will advance this educational mission by:

- Educating listeners in the communities being served about current events, our local government and school systems, emergency information, and public affairs programming that affects them.

- Broadcasting music and entertainment programming that features local talent, arts and cultural work from a variety of local and regional organizations, and overall fostering community connections.

- Providing broadcast opportunities for grassroots community organizations, community members, as well as partnering with schools, seniors, and other special interest groups to teach media production.

- Establishing a reliable community resource for the free and open access to truthful information and reporting without commercial motives, programming interruptions, or political biases whatsoever.

The Tolland and Windham regions are distinct in Connecticut because of their relative remoteness, allowing for a large residential community in addition to agriculture and education in the "Quiet Corner." As well, the proposed service area is nearby both the University of Connecticut and Eastern Connecticut State University.

These populations are currently underserved by local and regional media outlets, a fact we want to change.

As an independent public service, WHKA FM 87.7 aims to promote the values and considerations of the communities being served, provide a forum for neighborhood dialogue and artistic expression, and enhance first-amendment activities through programming to serve the public interest - radio for our community.

### Sample Programming

- Community Spotlights - Feature stories highlighting unsung heroes, local initiatives, and community success stories regularly and working with one-of-a-kind local businesses to build awareness.

- Fine Arts and Culture - Presenting a rich array of fine arts, music, dance, and theatre available in "our backyard" including promotion of the programs offered by UConn. Many are free to the public.

- Local Sports - Live and tape-delayed broadcast of the community's favorite sports, including unique commentary and analysis, opportunities for live production by students and community members.

- Democracy Now - A daily independent news hour including a variety of news topics, interviews, and diverse perspectives from around the world. Also, forever noncommercial and audience-supported.

# REQUESTS FOR WAIVER OF RULE

## Transmission Frequency

WHKA FM 87.7 Inc. respectfully requests a waiver with regard to 47 CFR Sections 73.310, 73.805, 73.201, 73.501, and 73.512 of the Commission's rules. As noted in our technical exhibit, this application is to propose a new LPFM facility to provide noncommercial educational radio service operating on FM channel 199 (87.7 MHz).

Unfortunately, the geographical nature of Connecticut has resulted in no open so-called "traditional" frequencies for new LPFM service anywhere in Mansfield, or any neighboring communities, according to available resources. The FCC recognizes this difficulty for other stations and has allowed them to use FM channel 200 (87.9 MHz) as outlined in 73.512(a)(2). However, the only invocations of that section, for (D)KSFH and K200AA, were in West Coast communities where the closest-distance adjacent stations used FM channel 202 (88.3 MHz).

In Connecticut and neighboring markets, there is a higher concentration of stations on FM channel 201 (88.1 MHz) AND less Channel 6 TV stations, which affords 87.7 MHz the better choice to avoid interference. There is a considerable public interest benefit for radio stations on FM 87.7, coupled with all of the initiatives of the LPFM service. We want to establish a broadcast that serves our community without commercial input.

It is also understood that the 82 to 88 MHz band was traditionally allocated to Channel 6 TV stations with an audio carrier at 87.7 MHz. Many of these facilities took advantage of their dial positions, run as radio stations during the analog era. This year, the Commission codified rules which allow these "FM6" operations to continue in a "hybrid" digital format, proving that radio operations on FM 87.7 serve the public interest and necessity.

FCC Chairwoman Jessica Rosenworcel said specifically of the local radio stations on FM 87.7, offering services similar to what we propose: *"These are small stations that are a big deal to their listeners...In a world where content feels like it is everywhere, there is still something special about local radio and a signal in the air."*

The public greatly values the audio service of active radio stations on FM 87.7 and that of LPFM stations. In an isolated area such as Storrs-Mansfield, the establishment of a new LPFM station operating on FM 87.7 would allow for further community connections, diversity in media consumption, and educational advancement.

*This application erroneously marks FM channel 201 (88.1 MHz) as the desired frequency due to limitations of the Licensing and Management System portal. Any automatic or calculated reference to FM channel 201 should NOT be considered, and evaluated on the basis of this request to operate on FM channel 199 (87.7 MHz).*

*Mr. Jim Bradshaw also confirmed via phone conversation in September 2023 that an application filed in this fashion, with this request and exhibit, would be considered fairly by the Media Bureau in the LPFM process.*

## Channel 6 Distance Separation

WHKA FM 87.7 Inc. also requests a waiver with regard to 47 CFR Section 73.825 and 74.1205 of the Commission's rules if necessary. There are no Channel 6 TV stations in the proposed area of service. The closest, WVCC Westmoreland, NH (Facility No. 186686), is 95.38 kilometers distant from the proposed LPFM tower site.

The requested facility's 50 dBu interference contour lies completely outside of WVCC's 47 dBu service contour, satisfying the method of protection outlined in 74.1205(c). Additionally, the legal representative of WVCC has provided a statement concurring that the proposed station will not cause any objectionable interference.

## *Contour Separation with WVCC TV*



| | |
|---|---|
| Direction: | True North: 52.4°<br>Magnetic North: 66° |
| Field Strength at Site: | 30.11 dBu |
| Signal Margin: | 2.11 dB |

*It is also important to note that while WVCC is licensed to Westmoreland, NH, its facilities are located far outside of their community of license, in Needham, MA.*


## WHKA FM 87.7 - Coordination with WVCC TV

**Dan Alpert** <dja@commlaw.tv>                         Mon, Dec 11, 2023 at 2:12 PM
To: "WHKA FM 87.7" <hackerairwaves@gmail.com>
Cc: "Scott Centers" <scenters@newsnetmedia.com>

Mr. Boots:

I've attached a BNA file from our engineer that you should be able to use to plot that in your software.  There is about 30 km of clearance from their planned transmitter site to the WVCC 47 dBu F(50,50) contour, which lands at about the same place as the 43 dBu F(50,90) contour you have plotted already.  Your 100 watt ERP is not going to have any material effect on WVCC, so we have no objection to it.


An e-mail message from:

Dan J. Alpert
The Law Office of Dan J. Alpert
2120 N. 21st Rd.
Arlington, VA  22201

703-243-8690 (business)
703-539-5418 (fax)

Website: www.commlaw.tv

(Please note:  This is a message sent by an attorney.  It is confidential.  It may contain privileged attorney-client communication or work product intended only for the individual or entity named within the message.  If you are not the intended recipient, or the agent responsible to deliver it to the intended recipient, any review, dissemination, distribution, or copying of this message is prohibited.  If this email message was received in error, it would be appreciated if you would notify me by reply e-mail and delete the original message from your system.  Thank you for your cooperation.)

📄 **wvcc47.bna**
   10K



# Secretary of the State of Connecticut
# Certificate of Incorporation

Domestic Non-Stock Corporation

## Filing Details

Filing Number:  0012042005          Filed On:     10/31/2023 8:00:00 PM

## Primary Details

| | |
|---|---|
| Name of Corporation: | WHKA FM 87.7 Inc. |
| Business ALEI: | US-CT.BER:2884012 |
| Business Email Address: | hackerairwaves@gmail.com |
| NAICS Information: | Radio Broadcasting Stations (516110) |
| Membership Statement: | The corporation shall not have members |
| Specify Class of Member: | N/A |
| Nature of Activities to be Conducted or Purposes to be Promoted by the Corporation: | WHKA is organized to provide noncommercial radio broadcasting and webcasting services. |
| | As an independent public service, WHKA aims to promote the values and considerations of the communities being served, provide a forum for neighborhood dialogue and artistic expression, and enhance first-amendment activities through programming to serve the public interest. |
| Other Provisions: | N/A |

Required Non-Profit Statement: The Corporation is non-profit and shall not have or issue shares of stock or make distributions.

## Appointment of Registered Agent

| | |
|---|---|
| Type: | Individual |
| Agent's Name: | Patrick Boots |
| Business Address: | 1206 Storrs Road No. 300, Storrs-Mansfield, CT, 06268, United States |

## Agent Appointment Acceptance

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUN 24 2026

RECEIVED

Agent Signature:   Patrick Boots
*This signature has been executed electronically*

## Incorporator Information

*Filing Number: 0012042005*                    *Filed On: 10/31/2023 8:00:00 PM*



# Secretary of the State of Connecticut
# Certificate of Incorporation
Domestic Non-Stock Corporation

| Name | Business Address |
| --- | --- |
| Patrick Boots | 1206 Storrs Road No. 300, Storrs-Mansfield, CT, 06268, United States |

## Acknowledgement

I hereby certify and state under penalties of false statement that all the information set forth on this document is true.

I hereby electronically sign this document on behalf of:
Name of Incorporator:     Patrick Boots
Incorporator Title:          N/A

Filer Name:          Patrick Boots
Filer Signature:     Patrick Boots
Execution Date:      11/01/2023
*This signature has been executed electronically*

# ARTICLES OF INCORPORATION

## ARTICLE 1 - Nomenclature and Location

*Section 1*   The name of this corporation shall be WHKA FM 87.7 Inc. (WHKA)

*Section 2*   The registered office of the corporation shall be in the State of Connecticut.

The corporation may have any number of offices at such places as determined by the Board, where the principal address shall be 1206 Storrs Road No. 300, Storrs-Mansfield, CT 06268.

## ARTICLE 2 - Purpose

*Section 1*   WHKA is organized to provide noncommercial radio broadcasting and webcasting services.

As an independent public service, WHKA aims to promote the values and considerations of the communities being served, provide a forum for neighborhood dialogue and artistic expression, and enhance first-amendment activities through programming to serve the public interest.

*Section 2*   Those services may be rendered through any means available to the corporation, including, but not limited to the operation of a broadcast facility operating on FM channel 199 (87.7 MHz).

*Section 3*   Notwithstanding anything herein to the contrary, the purposes of this corporation are limited exclusively to charitable, scientific, and educational purposes within the meaning of 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

## ARTICLE 3 - Board of Directors and Operations

*Section 1*   The activities of the corporation shall be managed under the direction of the Board. The affairs and business of the corporation shall be exercised by, or through the authority of, the Board except as otherwise provided by statute, these articles, or a resolution of the Board.

*Section 2*   The authorized number of directors of the corporation shall not be limited, but will comprise at least the state minimum. The number may change to accommodate growth as needed.

*Section 3*   Each director shall hold their office for a period of two years (24 months). There is no limit to the number of terms a director may serve.

*Section 4*   Directors shall be of the age of majority and voted into office by a resolution of the Board.

Each director must possess or be willing to develop relevant experience and knowledge in the day-to-day operations of the corporation or in any other areas as determined by the Board.

*Section 5*   Any director may be removed from office by a resolution of the Board if they engage in activities contrary to the interests of the corporation, given unquestionable proof or by virtue of immoral, inappropriate, and-or illegal conduct or otherwise agreed upon common sense.

*Section 6*   Regular meetings shall be held with at least two days (48 hours) notice to the Board.

Special meetings may be called at any time by the Chairman of the Board, or by two or more directors, as cosignatories, upon at least two days (48 hours) notice to the Board.

*Section 7*   The Chairman of the Board and a majority of directors present shall constitute a quorum.

| | |
|---|---|
| *Section 8* | Members of the Board may participate in meetings through the use of telephone conference or other communications methods as agreed upon by the Board. Upon such presence, any votes taken through these means shall be recorded and counted towards a quorum. |
| *Section 9* | Any action required or permitted to be taken by the Board may be taken without a meeting. |
| | Relevant extenuating circumstances calling for this action shall be recorded and revisited at the next Board meeting and-or by applicable communications and filing systems. |
| *Section 10* | The Board shall act as the officers of the corporation. |
| | Each officer shall possess the powers customary to the office held by that officer or as prescribed by the organization, laws of the State of Connecticut, and other applicable codes. |
| *Section 11* | The Executive Director shall have supervision over the day-to-day business and operations of the corporation subject to the authority of and duties assigned by the Board. |
| | The Chairman of the Board shall fulfill the position of the Executive Director. |
| *Section 12* | Any director may resign at any time by giving written notice to the Chairman of the Board. |
| *Section 13* | Decisions made by the Board shall be considered final, and there shall be no appeal to any court regarding their decisions barring any immoral, inappropriate, and-or illegal conduct. |

## ARTICLE 4 - Governance and Amendments

| | |
|---|---|
| *Section 1* | This constitution and all its subsequent amendments shall serve as the governing law through which the corporation shall be operated unless otherwise resolved by the Board. |
| *Section 2* | These bylaws may be amended by a majority vote of the Board. |
| *Section 3* | No amendment imposed through actions of the Board shall stand if the character of that amendment breaches the relevant laws of the State of Connecticut or Internal Revenue Code. |
| *Section 4* | The Executive Director may delegate intercorporate responsibilities, such as signature authority. |
| *Section 5* | Notwithstanding any other provision of these articles, this corporation shall not, except to an insubstantial degree, engage in activities that are not in furtherance of the purposes herein. |
| *Section 6* | The corporation will embody the rights afforded by the First Amendment of the United States Constitution, and will ensure its part to advocate for freedom of speech and of the press. |

## ARTICLE 5 - Finances

| | |
|---|---|
| *Section 1* | No part of the net earnings of the corporation shall inure to the benefit of or be distributable to its officers or other private people, except that the corporation shall be authorized to pay reasonable compensation and distributions for services rendered. |
| *Section 2* | No substantial part of the activities of the corporation shall be in attempting to influence legislation or intervening in any political campaign for public office. |
| *Section 3* | Directors or officers of this corporation shall not be liable and no personal liability shall, in any event, be attached to such directors or officers in connection with any of its undertakings. |
| *Section 4* | The Board shall adopt an operating budget, which specifies expenditures by type and amount. |

| | |
|---|---|
| *Section 5* | All funds in the name of the corporation shall be deposited from time to time in cooperation with such banks, trust companies, and-or other depositories as determined by the Board. |
| *Section 6* | The Board may accept, on behalf of the corporation, any cash contribution, gift, bequest, or devise for the general purposes or for any special purpose as it pertains to the corporation. |
| *Section 7* | Prior to acceptance of a significant non-cash contribution or gift, the Board shall determine that such non-cash contribution or gift would be consistent with the purposes herein. |
| | In-kind services and donations as part of initiatives conducted by the corporation or in furtherance of the purposes herein shall be allowable as determined by the Board. |
| *Section 8* | The corporation shall reserve the right to retain all or any part of any property - real, personal, tangible, or intangible - acquired by it in whatever manner and pursuant to the resolution and judgement of the Board, to invest and reinvest any funds held by it without being restricted to the class of investments available to trustees by law or any similar restrictions or codes. |
| *Section 9* | The Executive Director shall reserve the right to direct the business and transactions of the corporation on behalf of the Board, including but not limited to entering into contracts, asset distributions, investments, and any other agreements unless inhibited by statute or laws. |
| *Section 10* | The Board may authorize any officer or agent of the corporation to enter into agreements with and-or accept funds from the United States and its agencies, the State of Connecticut and its agencies, other states, and public or private corporations, organizations, and people; and that they may generally exercise the powers necessary to further the purposes of the corporation. |
| *Section 11* | Upon the dissolution of the corporation, assets shall be distributed for one or more exempt purposes as determined by the Board. Any such assets not so disposed of shall be distributed to applicable organizations operated exclusively for educational purposes as resolved by the Board with the cooperation of a Court of Competent Jurisdiction in the State of Connecticut. |

## ARTICLE 6 - Conflicts of Interest

| | |
|---|---|
| *Section 1* | Upon full disclosure of a direct or indirect interest in any business or transaction relating to or incidental to the corporation, the Board or officers may be permitted to maintain interests in any such agreement, notwithstanding that at such time they may also be acting as individuals, beneficiaries, or as agents for other people or corporations; provided that any such agreement involving such interests shall not be in violation of any regulations regarding private benefit. |
| *Section 2* | Any member of the Board or equivalent officer of the corporation with such interests shall not participate in decisions or determinations regarding any such agreements or transactions. |
| *Section 3* | Prior to entering into such transactions, the Board will contemporaneously document in writing the basis for its approval, including its consideration of any alternative transactions. |

## ARTICLE 7 - Miscellaneous

| | |
|---|---|
| *Section 1* | The singular when used herein may also refer to the plural, and vice versa, as appropriate. |
| *Section 2* | The captions and headings inserted herein are for convenience only and in no way define, limit, or describe the scope or intent of these Bylaws, nor in any way their interpretation. |
| *Section 3* | If any provision of these Bylaws is held inoperative by judicial proceeding, the remainder of this and any corresponding or applicable documentation shall remain operative and binding. |



Federal Communications Commission
Washington, D.C. 20554

March 10, 2025

*In Reply Refer to:*
1800B3-CEG

WHKA FM 87.7 Inc.
Attn: Patrick Boots, Director
1206 Storrs Rd No. 300
Storrs-Mansfield, CT 06268

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUN 24 2026

RECEIVED

Re:     **WHKA FM 87.7 Inc.**
New LPFM, Storrs-Mansfield, Connecticut
Facility ID No. 788033
Application File No. 233185

**Waiver Request**

Dear Applicant:

We have before us the above-referenced application (Application) for a new low power FM (LPFM) station at Storrs-Mansfield, Connecticut (Station), filed by WHKA FM 87.7 Inc. (WHKA) on December 15, 2023.  WHKA requests a waiver of the Commission's rules to allow it to operate at 87.7 MHz,[1] which is located in the broadcast television frequency band—specifically, in the frequency band assigned to TV Channel 6 (TV6) (Waiver Request).[2]  For the reasons set forth below, we deny the Waiver Request and dismiss the Application for failure to specify a valid FM broadcast radio operating channel.

**Background.**  The Application was filed on December 15, 2023, during the 2023 new LPFM filing window.[3]  WHKA argues that a waiver allowing it to operate in the TV band is warranted because: (1) there are no open FM band frequencies for new LPFM stations in its local area;[4] (2) LPFM service

---

[1] *See* Application, attachment entitled "WHKA FM 87.7 – Requests for Waiver of Rule.pdf" (uploaded Dec. 6, 2023).  WHKA also refers to 87.7 MHz as "Channel 199."

[2] *See* 47 CFR §§ 73.310(a)(10)-(11), 73.805, 73.201, and 73.501.  The FM broadcast radio band is the band of frequencies extending from 88.1 MHz to and including 107.9 MHz and the TV6 frequency band is 82 MHz to 88 MHz.  WHKA also requests waivers of sections 73.825 and 74.1205(b) of the rules to allow it to be short-spaced to low power television (LPTV) TV6 station WVCC-LD, Westmoreland, New Hampshire (WVCC).  Waiver Request at 1-3 (citing 47 CFR §§ 73.825 (establishing spacing requirements for LPFM stations with respect to low power TV, TV translator, and Class A TV stations authorized on TV6) and 74.1205 (establishing minimum distance separation (spacing) requirements for noncommercial educational (NCE) FM translator stations with respect to TV Channel 6 stations)).  We cannot consider this request because sections 73.825 and 74.1205 do not set out spacing requirements for the requested frequency of 87.7 MHz and therefore there is no applicable spacing requirement to waive.  Because we dismiss the Application on another ground, we need not reach the issue of what WHKA's spacing requirement would be for its specified frequency and subsequently whether to waive such a requirement.

[3] *See generally, Media Bureau Announces Filing Procedures and Requirements for November 1 – November 8, 2023, Low Power FM Filing Window*, Public Notice, 38 FCC Rcd 6660 (MB 2023) (*Procedures Public Notice*).  Based on a request from LPFM advocates, the Bureau subsequently delayed the window until December 6, 2023.  *Media Bureau Announces Revised Dates for LPFM New Station Application Filing Window*, Public Notice, 38 FCC Rcd 9589 (MB 2023).  The Bureau subsequently extended the close of the window until December 15, 2023.  *Media Bureau Announces Extension of LPFM New Station Application Filing Window*, Public Notice, 38 FCC Rcd 11882 (MB 2023).

[4] Waiver Request at 1.

generally is in the public interest;[5] (3) a limited number of low power television (LPTV) Channel 6 stations are authorized to broadcast grandfathered FM radio service on 87.75 MHz;[6] and (4) Class D NCE FM stations are permitted to propose operation on Channel 200 (87.9 MHz in the TV band) if no other commercial frequencies are available, unless the station would be within 250 miles of the Canadian border or would cause interference to an FM station operating on Channels 201, 202, or 203, or to TV Channel 6 stations.[7]

**Discussion.** We find that WHKA has not cited special circumstances that would justify assigning the Station to a frequency in the TV band. The Commission's rules may be waived for good cause shown.[8] When an applicant seeks waiver of a rule, it must plead with particularity the facts and circumstances which warrant such action.[9] The Commission must give waiver requests "a hard look," but an applicant for waiver "faces a high hurdle even at the starting gate"[10] and must support its waiver request with a compelling showing.[11] Waiver is appropriate only if both (1) special circumstances warrant a deviation from the general rule, and (2) such deviation better serves the public interest.[12] WHKA has failed to meet this burden.

First, local unavailability of open channels in the FM band is not a special circumstance justifying waiver of the FM radio band allocation. Many applicants in densely populated areas could similarly have difficulty locating an available FM frequency. Therefore, allowing LPFM stations to operate in the TV band due to local unavailability of FM band channels would substantially undermine the integrity of our frequency allocations framework. A policy decision of such general applicability should be made in a rulemaking proceeding, not in the context of an individual waiver request.[13]

Second, WHKA's point that LPFM service is generally beneficial and in the public interest is applicable to all LPFM applicants and therefore not a circumstance specifically relating to the Application. Again, authorizing LPFM stations to operate in the TV band on this basis would undermine

---

[5] Waiver Request at 1 ("The public greatly values the audio service of active radio stations on FM 87.7 and that of LPFM stations. In an isolated area such as Storrs-Mansfield, the establishment of a new LPFM station operating on FM 87.7 would allow for further community connections, diversity in media consumption, and educational advancement.").

[6] Waiver Request at 1; *see generally, Amendment of Parts 73 and 74 of the Commission's Rules to Establish Rules for Digital Low Power Television and Television Translator Stations*, Fifth Report and Order, 38 FCC Rcd 6975, 6980, para. 8 (2023) (*LPTV Order*); 47 CFR § 74.790(o).

[7] Waiver Request at 1 (citing 47 CFR § 73.512(a)(2)).

[8] 47 CFR § 1.3.

[9] *WAIT Radio v. FCC*, 418 F.2d 1153, 1157, para. 2 (D.C. Cir. 1969) (*WAIT Radio*).

[10] *WAIT Radio*, 418 F.2d at 1157, para. 2.

[11] *Greater Media Radio Co., Inc.*, Memorandum Opinion and Order, 15 FCC Rcd 7090, 7094, para. 9 (1999).

[12] *NetworkIP, LLC v. FCC*, 548 F.3d 116, 125-128 (D.C. Cir. 2008) (citing *Northeast Cellular Telephone Co.*, 897 F.2d 1164, 1166 (1990)).

[13] *See, e.g., Birmingham Christian Radio, Inc. and Radio South Inc.*, Memorandum Opinion and Order, 18 FCC Rcd 7909, 7915, para. 19 (2003) (finding that arguments challenging market definitions are more appropriately addressed in a rulemaking proceeding); *Sunburst Media LP and Clear Channel Broadcasting Licenses, Inc.*, Memorandum Opinion and Order, 17 FCC Rcd 1366, 1368, para. 6 (2002) ("[I]t has long been Commission practice to make decisions that alter fundamental components of broadly applicable regulatory schemes in the context of rulemaking proceedings, not adjudications"); *Great Empire Broadcasting, Inc.* 14 FCC Rcd 11145, 11148, para. 8 (1999) ("It is generally inappropriate to address arguments for a change in rules where third parties, including those with substantial stakes in the outcome, have had no opportunity to participate, and in which we, as a result, have not had the benefit of a full and well-counseled record.") (internal citations omitted).

the basic frequency allocation framework and should not be undertaken on a waiver basis but in a notice-and-comment rulemaking with full input from all stakeholders.

Third, we find that WHKA's reliance on section 74.790(o) is misplaced. In 2023, the Commission adopted section 74.790(o) to preserve existing analog FM radio operations provided by 14 LPTV licensees on 87.75 MHz (FM6 operations).[14] In doing so, it imposed strict limitations on the provision of grandfathered FM6 operations[15] and prohibited any additional FM6 operations. The Commission also declined to adopt a proposal to repurpose TV6 spectrum for additional FM stations.[16] WHKA has not demonstrated special circumstances that would justify an exception to the Commission's previous conclusions that use of TV6 would not be feasible, because of the possibility of interference, and because TV6 spectrum is still needed for broadcast television use, especially in densely populated areas such as the one at issue.[17]

Fourth, WHKA's waiver request is unsupported by section 73.512(a)(2) of the Commission's rules, which allows Class D NCE FM stations to operate on Channel 200 (87.9 MHz) if no other commercial frequencies are available.[18] The Commission provided this flexibility to facilitate the mandatory migration of Class D NCE FM stations to the FM commercial band without loss of existing stations.[19] Not only is the Station not a Class D FM station, but, due to treaty restrictions, Channel 200 is not available for any station located within 250 miles of the Canadian border, which includes Storrs-Mansfield, Connecticut.[20] Therefore, neither section 73.512(a)(2) itself or the policy considerations underlying it are applicable to the Waiver Request.

For all these reasons, we conclude that WHKA has not established special circumstances that would warrant a deviation from the Commission's fundamental frequency allocations framework. Therefore, we deny the Waiver Request and dismiss the Application for failure to specify a valid FM broadcast radio operating channel as set out in sections 73.310(a)(10)-(11),[21] 73.805,[22] 73.201,[23] and 73.501[24] of the Commission's rules.

---

[14] *LPTV Order*, 38 FCC at 6980, para. 8; 47 CFR § 74.790(o).

[15] 47 CFR § 74.790(o) (providing that FM6 LPTV stations may provide FM6 operations on an ancillary or supplementary basis under certain conditions, including but not limited to: (1) the FM6 LPTV station was providing such radio service prior to June 7, 2022; (2) the FM6 LPTV station is operating in ATSC 3.0 digital format; (3) FM6 operations are conducted only on 87.75 MHz; (4) FM6 operations are conducted on a non-interference basis to any other licensed user, including but not limited to broadcast television or radio users; (5) the FM6 LPTV station's FM6 service contour must be contained within the relevant TV station's protected contour; and (6) the FM6 LPTV station must provide at least one stream of synchronized video and audio programming while operating).

[16] *LPTV Order*, 38 FCC Rcd at 7007-8, paras. 61-64

[17] *Id.* at 7007-8, paras. 61 and 64.

[18] *See* 47 CFR § 73.512(a)(2).

[19] *Changes in the Rules Relating to Noncommercial Educational FM Broadcasting Stations*, Second Report and Order, 69 FCC.2d 240, 249, para. 26(1978) (*Second Report and Order*).

[20] *Id.* at 260, para. 62; 47 CFR § 73.512(a)(2).

[21] 47 CFR § 73.310(a)(10)-(11) (defining the FM broadcast band as the band of frequencies extending from 88 to 108 MHz).

[22] 47 CFR § 73.805 (providing that all of the frequencies listed in 47 CFR § 73.201 are available for LPFM stations).

[23] 47 CFR § 73.201 (assigning frequencies in the FM band to 100 channels of 200 kHz each).

[24] 47 CFR § 73.501 (listing frequencies available exclusively for NCE FM broadcasting (Channels 200-220)).

**Conclusion.** For the reasons stated above, **IT IS ORDERED** that WHKA FM 87.7 Inc.'s waiver request is **HEREBY DENIED** and its application for a new LPFM station, filed on December 15, 2023 (Application File No. 233185), **IS DISMISSED.**[25]

Sincerely,

Albert Shuldiner
Chief, Audio Division
Media Bureau

---

[25] Under the Commission's *nunc pro tunc* amendment policy, an applicant may file a single curative amendment accompanied by a petition for reconsideration within 30 days of dismissal. *See generally, Commission States Future Policy on Incomplete and Patently Defective AM and FM Construction Permit Applications*, Public Notice, 56 RR 2d 776 (1984). This amendment must cure all defects in the relevant application and, if dismissed for a second time, the applicant will not be provided with an additional opportunity to amend. *Id.*; *Creation of a Low Power Radio Service*, Report and Order, 15 FCC Rcd 2205, 2257 n.209 (2000).

# FEDERAL COMMUNICATIONS COMMISSION Washington, DC 20554

In the matter of:

WHKA FM 87.7 Inc.

New LPFM, Storrs-Mansfield, CT

Facility No. 788033

Application File No. 233185

To:    Marlene Dortch, Office of the Secretary

Albert Shuldiner, Chief of the Audio Division, Media Bureau

UNITED STATES COURT OF APPEALS FOR DISTRICT OF COLUMBIA CIRCUIT

JUN 24 2026

RECEIVED

## PETITION FOR RECONSIDERATION

WHKA FM 87.7 Inc. (WHKA) here files a Petition for Reconsideration (Petition) concerning the above-captioned application for a new Low Power FM (LPFM) facility to provide noncommercial radio service to the Storrs-Mansfield, CT community, operating on FM channel 199 (87.7 MHz) through a request for waiver of rule.[1]

WHKA's application was dismissed on March 10th 2025 via electronic mail notice from Keith Coburn, Broadcast Program Assistant at the Audio Division of the Media Bureau, in reference to the waiver request and including an attachment, a letter attributed to Albert Shuldiner, Chief of the Audio Division (Dismissal Letter)[2].

Through this petition, WHKA contends the concerns in the dismissal letter are inaccurate or misplaced - and respectfully requests reinstatement and acceptance of the application, as it would serve the public interest.

## Overview

WHKA timely filed an application for a new LPFM facility within the Commission's Third-Generation LPFM Filing Window[3], on December 15th 2023. The proposed station was <u>not</u> apparently or determined to be mutually exclusive (MX)[4], and WHKA has always fulfilled all applicant eligibility requirements as a nonprofit corporation.

On March 10th 2025, WHKA received electronic mail notice from the Audio Division declaring:

> Attached, please find the FCC letter from today (March 10th 2025) concerning the waiver request of the Commission's rules relating to the application for a New LPFM station in torrs-Mansfield, MA. *[sic]*

Even if we excuse the impertinent misspelling and wrong state abbreviation, the attached dismissal letter says:

> We conclude that WHKA has not established special circumstances that would warrant a

---

[1] See: Application attachment entitled "Requests for Waiver of Rule" (Waiver Request)

[2] Waiver Request Dismissal Letter from Albert Shuldiner (Reference No. 1800B3-CEG - March 10th 2025)

[3] *Media Bureau Announces Filing Procedures and Requirements for the November 1st-November 8th 2023 Low Power FM Filing Window* (DA 23-642 - July 31st 2023) et seq. and *Media Bureau Announces Extension of LPFM New Station Application Filing Window* (DA 23-1150 - December 11th 2023) (2023 LPFM Filing Window Notice and Extension)

[4] *Media Bureau Identifies Groups of Mutually Exclusive Applications Submitted in the December 2023 LPFM Filing Window* (DA 24-256 - March 15th 2024) (2023 LPFM Filing Window MX Notice)

deviation from the Commission's fundamental frequency allocation framework.

Therefore, we deny the Waiver Request and dismiss the Application for failure to specify a valid FM broadcast radio operating channel as set out in sections 73.310(a)(10)-(11), 73.805, 73.201, and 73.501 of the Commission's rules.[5]

The Commission draws this conclusion on the basis that 87.7 MHz is not permissible for FM broadcast radio use, despite evidence to the contrary, since it is a frequency traditionally allocated to Channel 6 TV stations.

## *Review*

Through the Communications Act of 1934 (1934 Act), the US Congress established the Federal Communications Commission (FCC or Commission) "so as to make available to all the people of the United States, without discrimination...a rapid, efficient, nationwide, and worldwide wire and radio communication service."[6]

The 1934 Act, and its amendments, grants the Commission the authority to regulate broadcast users through the issuance of licenses "to those who would serve the public interest, convenience, and necessity"[6] after considering "both the relative needs of various communities for additional broadcast outlets, and specified engineering standards designed to prevent interference among stations and other communications users."[7]

Accordingly, WHKA's application and waiver request respect these facts: FM 87.7 is the only frequency which, under current LPFM standards, would not apparently cause interference to licensed broadcasts in the proposed community of Storrs-Mansfield, CT - or in many other communities in Connecticut, for that matter - and fulfill LPFM's core service goals of "provid[ing] opportunities for new voices to be heard and ensur[ing] that [the FCC] fulfills their statutory obligation to authorize facilities in a manner that best serves the public interest."[8]

All parties can agree that radio services, including LPFM, that cause objectionable interference to existing users does not serve the public interest unless it can be remediated. It is similarly antithetical to the Commission's public interest standard to dismiss a technically-sound application for a new FM radio station which would <u>not</u> cause harmful interference to any other broadcast facility, such as the station that WHKA has proposed.

Generally, the Commission may waive any rule if there is good cause to do so and, in making this determination, may take into account considerations such as hardship, equity, or more effective implementation of overall policy on an individual basis.[9]

In the instant case, waiver is appropriate because the relief requested aligns with Commission precedent for use

---

[5] Dismissal Letter at pg. 3

[6] *Communications Act of 1934* (73rd Congress - June 1934) (1934 Act) codified as amended at 47 USC 151 et seq.

[7] *The Public and Broadcasting* at pg. 5 (sec. "FCC Regulation of Broadcast Radio and Television") via 47 CFR 73.4210

[8] *Creation of a Low Power Radio Service*, Report and Order (Docket No. 99-25 - FCC 00-19 - January 2000) (LPFM Report and Order) at par. 1

[9] *Northeast Cellular Telephone Co. vs. FCC* (897 F 2d 1164 - 1990) ("Waiver is appropriate only if both 1. special circumstances warrant a deviation from the general rule, and 2. such deviation better serves the public interest [and will not undermine the policy underlying the rule].") and as codified at 47 CFR 1.3

of FM radio channels, good technical and regulatory practice, and the agency's goals to foster new service and diversify broadcast ownership. A denial of WHKA's application plainly <u>does not</u> serve the public interest.

The dismissal letter alleges that "allowing LPFM stations to operate in the TV band due to local unavailability of FM band channels would substantially undermine the integrity of [the FCC's] frequency allocation framework"[10] but such a conclusion is inaccurate in regard to WHKA's original application and waiver request.

As was discussed and respected in the waiver request, and is now commonly known, in 2023 the Commission authorized 14 broadcast licensees in various locations nationwide to permanently operate analog radio services on FM channel 199 (FM 87.7) following a period of special temporary authority and other experiments.[11]

In the analog era, these 14 facilities (and others) operated as Channel 6 TV stations, which led to the technical coincidence that their audio carrier fell at 87.7 MHz - and because the NTSC standard was interoperable with FM radio, consumers could tune to those TV stations using commonly available radio receivers.[12] Nearly every radio receiver sold in the last forty years, and many older models, have included the ability to tune to FM 87.7.[13]

Due to economical or programming reasons, some Channel 6 TV station licensees decided to take advantage of their dial positions and run those facilities as pseudo-radio stations instead, labeled "FM6" operations.[12] Since there is no technical difference between an analog Channel 6 TV station offering FM6 service and one which does not, at the time FM6 did not disturb the Commission's "frequency allocation framework" or other rules.

The Commission's mandate for TV and LPTV stations to convert to digital operations, culminating in a July 13th 2021 deadline, resulted in FM6 stations no longer being able to provide an analog audio carrier at 87.7 MHz.[12]

After a notice-and-comment rulemaking process, the Commission determined that FM 87.7 radio operations <u>do in fact</u> serve the public interest and are "analogous to ['traditional' FM radio] services" - so they must comply with Part 73 rules, including emergency alert and public file requirements[14], in addition to operating on a non-interference basis "to any other licensed user, including but not limited to broadcast television or radio users."[15]

WHKA's application clearly satisfies the Commission's public interest standard, equivalent to FM6 facilities and

---

[10] Dismissal Letter at pg. 2

[11] *Amendment of Parts 73 and 74 to Establish Rules for Digital Low Power Television and Television Translator Stations,* Fifth Report and Order (Docket No. 03-185 - FCC 23-58 - July 2023) (FM6 Fifth Report and Order) at par. 8

[12] *Amendment of Parts 73 and 74 to Establish Rules for Digital Low Power Television and Television Translator Stations,* Fifth Notice of Proposed Rulemaking (Docket No. 03-185 - FCC 22-40 - June 2022) (FM6 Fifth Notice of Proposed Rulemaking) at par. 3 et seq. (FM6 is also known by the colloquialism "Franken-FM.")

See also, generally: *Digital switch cost 6 ABC its radio audience* (Philadelphia Inquirer - July 2nd 2009) ("In a 'frequency fluke,' listeners could tune in to [WPVI] 6 ABC at 87.7 FM on car or home radios and listen to the audio portion of 6 ABC's shows") and *WRGB ends FM radio simulcast* (Albany Times-Union - August 26th 2009) ("The simulcast had been available for years at 87.7 FM, but it disappeared in June when television stations were mandated to end analog over-the-air broadcasting in favor of digital signals.")

[13] See generally: FM6 Fifth Notice of Proposed Rulemaking at par. 48 ("We note that FM radio receivers...receive...87.7 [and] 87.9 MHz")

[14] FM6 Fifth Report and Order at par. 53-58 and as codified at 47 CFR 74.790(o), citing 47 USC 336(b)(3)

[15] FM6 Fifth Report and Order at par. 39 from FM6 Fifth Notice of Proposed Rulemaking at par. 25

FM stations at other frequencies. The proposed station is technically indistinguishable save for a lower power.

The dismissal letter further alleges that "[WHKA's] use of TV6 spectrum would not be feasible, because of the possibility of interference, and because TV6 spectrum is still needed for broadcast television use, especially in densely populated areas such as the one at issue."[5]

While concerns regarding potential interference to licensed users are warranted when any new broadcast facility is proposed, WHKA addressed these particulars in its original application technical exhibit[16] and waiver request. WHKA's proposed facility satisfies the Commission's rules regarding interference protection for LPFM stations to adjacent FM channels, translator and booster inputs, as well as "co-channel" Channel 6 TV stations.

There are no Channel 6 TV stations in the proposed area of service. The two closest, WVCC Westmoreland, NH (Needham, MA) and WNYZ New York, NY[17], are addressed in the exhibit. Neither TV station would be apparently susceptible to interference from the proposed LPFM station due to significant distance and contour separation.

Additionally, the legal representative of WVCC has provided a statement concurring that the proposed station will not cause harmful interference, alleviating the need to follow the Channel 6 distance separation figures.[18] Even if we use the FM translator rules for contour separation-based protection of Channel 6 TV stations, which is allowable for LPFM applications requesting a waiver[19], the proposed station's 50 dBu 50-10 interference contour lies completely outside of WVCC's 47 dBu 50-50 service contour - as illustrated in the original request.[20]

As for Channel 6 TV spectrum being "still needed for broadcast television use"[5], that is beside the point because Channel 6 is not present in the Commission's digital TV table of allotments for Connecticut or any surrounding states[21], and use for TV still does not supersede the public interest benefits allowing operation on FM 87.7.[22] Likewise, WHKA would be happy to establish noncommercial educational Channel 6 LPTV (or full power TV) service in Connecticut alongside an FM6 radio facility, if such a proposal was amenable to the Commission.

The dismissal letter also purports to address the narrative describing use of FM channel 200 (87.9 MHz) in the request, stating "neither section 73.512(a)(2) itself or the policy considerations underlying it are applicable."[5]

WHKA decided to describe this prior use of FM 87.9 as an additional example that the Commission's definition

---

[16] See: Application attachment entitled "Comprehensive Technical Exhibit" (Technical Exhibit) at pg. 2

[17] See generally: WVCC LD (Facility No. 186686) and WNYZ LD (Facility No. 56043)

[18] Waiver Request at pg. 3, citing 74 CFR 73.825 ("The following spacing requirements will apply...unless the application is accompanied by a written agreement between the LPFM applicant and each affected TV Channel 6 broadcast station concurring with the proposed LPFM facilities.")

[19] *Amendments of Parts 73 and 74 to Improve the Low Power FM Radio Service Technical Rules*, Report and Order (Docket No. 19-193 - FCC 20-53 - April 2020) (LPFM Technical Order) at par. 35 ("LPFM applicants could make...a showing using the FM translator TV6 contour protection requirements of section 74.1205(c).")

[20] Waiver Request at pg. 2

[21] 47 CFR 73.606, citing 73.622

[22] See also: Dismissal Letter at pg. 3, citing FM6 Fifth Report and Order at par. 61 et seq. (Refusal of a proposal to re-allocate irreceivable TV Channel 6 frequencies, 82.1 to 87.5 MHz, as justification for dismissal. We did not propose their use, so that point is irrelevant.)

4

of "FM broadcast band"[23] is already not conclusive as written, and as an example of a "special circumstance" equivalent in standing to ours which would allow for the waiver of rule[9] to use a so-called alternate channel.

In 1978, the Commission mandated that "low power" (Class D) FM stations move from frequencies within the "reserved band" (91.9 MHz and below) to the "commercial band" (92.1 MHz and above) in order to accommodate more noncommercial FM stations in the "reserved band."[24] Recognizing that some of these stations would not be able to choose a frequency without causing interference, the Commission allows the use of FM 87.9.[25] The only facilities to have invoked this section are (D)KSFH Mountain View, CA and K200AA Sun Valley, NV.[26]

The dismissal letter states further "not only is [WHKA's proposed] station not a Class D FM station, but, due to treaty restrictions, Channel 200 is not available for any station located within 250 miles of the Canadian border, which includes Storrs-Mansfield, Connecticut."[27]

The treaty the dismissal letter and rule part refer to, but do not cite, is one between the United States and Canada from 1947 - which was in effect when the rule was written in 1978.[28] However, that agreement was superseded in 1991[29] and states that international coordination need only be considered for FM stations within 320 km (198 mi) of the common border, regardless of class[30], or within 32 km (20 mi) of the border for LPFM stations.[31]

The technical exhibit outlined that since the distance to the nearest point along the common border is 359 km (223 mi), the application satisfies any international consideration for LPFM stations independent of frequency.[32]

Additionally, the proposed facility satisfies the current 1993 agreement for analog TV stations, as it is not within 32 km of the border and the 34 dBu 50-10 interference contour does not cross the border[33], in addition to exceeding the low-band VHF co-channel protection distances[34] - should that agreement have needed to apply.

---

[23] Dismissal Letter, citing the slightly inaccurate 47 CFR 73.310(a)(10)-(11) ("FM broadcast band: The band of frequencies extending from 88 to 108 MHz, which includes those assigned to noncommercial educational broadcasting.")

[24] *Changes in the Rules Relating to Noncommercial Educational FM Broadcast Stations*, Second Report and Order (Docket No. 20735 - FCC 78-384 - June 1978) (1978 Second Report and Order) at par. 11 ("Low power 'Class D' stations are intended to serve limited areas as, for example, a college campus.") and par. 24 et seq.

[25] 1978 Second Report and Order at par. 26 and par. 51 et seq. and as codified at 47 CFR 73.512(a)(2)

[26] See generally: (D)KSFH (Facility No. 62118) and K200AA (Facility No. 83363)

[27] Dismissal Letter at pg. 3, citing 47 CFR 73.512(a)(2)

[28] 1978 Second Report and Order at n. 19, citing the *North American Broadcast Agreement* (1947 US-Canada Agreement)

[29] *Working FM Agreement with Canada* (February 1991) (1991 US-Canada FM Agreement) at cover pg. 1 ("The new agreement between the two governments shall enter into force...and shall supersede the 1947 agreement.")

[30] 1991 US-Canada FM Agreement at cover pg. 3 ("Assignments made at points which are more than 320 kilometres from the nearest point on the border...will normally have no international significance.") and par. 1

[31] 1991 US-Canada FM Agreement at par. 4.1

[32] Technical Exhibit at pg. 4, citing 47 CFR 73.807(g)

[33] *Working TV Agreement with Canada* (November 1993) (1993 US-Canada TV Agreement) at par. 5.4.1 ("Proposals for low power stations not on allotted channels, at locations in excess of 32 km from the border, whose interfering 50-10 contour would not fall within the territory of the other country, may be authorized without referral or notification.")

It is also important to note that WVOA Westvale, NY operates FM 87.7 radio services pursuant to coordination with Canada.[35] Their higher powered use much closer to the border additionally illustrates that our proposed station will not be any cause for international concern alongside the rules of the 1991 US-Canada FM Agreement.

Moreover, FM translator stations are statutorily equivalent to LPFM stations as secondary services[36] and are likewise lower power. It stands to reason that since they are similarly situated, and because (a) noncommercial translator stations have used FM 87.9[26], an LPFM station should not be precluded[37] if it is in a comparable circumstance and otherwise technically qualified. The LPFM service is also purposively equivalent to Class D[24], eroding the claim that "the policy considerations [allowing use of an alternate channel] are not applicable."[5]

The dismissal letter asserts that "authorizing LPFM stations to operate in the TV band...should not be undertaken on a waiver basis but in a notice-and-comment rulemaking with full input from all stakeholders."[38]

WHKA contends that this point has already been satisfied via the process that resulted in the FM6 Fifth Report and Order allowing FM 87.7 radio operations. The Commission sought comment regarding use of FM 87.7 as early as 2014 in preparation for the mandate for LPTV stations to convert to digital operations by 2015[39] - but the FM6 issue was later tabled with no decision[40], and the digital transition deadline subsequently pushed to 2021.[41]

In 2019, the Commission opted to update the record on FM6 and sought additional comment[42], to which dozens of vested interests and other parties provided filings with diverse viewpoints, opinions, and suggestions. [43]

---

[34] 1993 US-Canada TV Agreement at Annex IV, Table 1

[35] See generally: WVOA LD (Facility No. 14319) and FM6 Fifth Report and Order at par. 27

[36] *Local Community Radio Act of 2010* (111th Congress - January 2011) (LCRA or 2010 Act) at sec. 5(3) ("FM translator stations, FM booster stations, and low power FM stations remain equal in status and secondary to...full-service FM stations")

[37] *Creation of a Low Power Radio Service*, Fourth Report and Order (Docket No. 99-25 - FCC 12-29 - March 2012) (LPFM Fourth Report and Order) at par. 12 and par. 25 from *Creation of a Low Power Radio Service*, Third Further Notice of Proposed Rulemaking (Docket No. 99-25 - FCC 11-105 - July 2011) (LPFM Third Further Notice) at par. 20 ("Given that...'stations' and 'applications' were used interchangeably [by] the Commission...before the LCRA was adopted, it seems reasonable to assume that Congress intended the same meaning when it used the term 'station' in the LCRA.")

[38] Dismissal Letter at pgs. 2 and 3

[39] *Amendment of Parts 73 and 74 to Establish Rules for Digital Low Power Television and Television Translator Stations*, Third Notice of Proposed Rulemaking (Docket No. 03-185 - FCC 14-151 - October 2014) (FM6 Third Notice of Proposed Rulemaking) at par. 47

[40] *Amendment of Parts 73 and 74 to Establish Rules for Digital Low Power Television and Television Translator Stations*, Third Report and Order and Fourth Notice of Proposed Rulemaking (Docket No. 03-185 - FCC 15-175 - December 2015) (LPTV DTV Report and Order) at n. 12 ("We intend to issue a decision on whether to permit digital LPTV stations to operate analog FM radio-type services on a supplementary basis at a later date.")

[41] *Suspension of September 1st 2015 Digital Transition Date for Low Power Television and TV Translator Stations* (DA 15-486 - April 2015) and LPTV DTV Report and Order at par. 9

[42] *Media Bureau Seeks to Update the Record on the Operation of Analog Radio Services by Digital LPTV Stations as Ancillary or Supplementary Services* (Docket No. 03-185 - DA 19-1231 - December 2019)

[43] See generally: Comments and Reply Comments filed into Docket No. 03-185 regarding DA 19-1231

The inquiry was made after a group of affected Channel 6 LPTV stations proposed FM 87.7 operations as a supplementary service - citing a rule part which provides that "a digital LPTV station may offer services of any nature, consistent with the public interest, convenience, and necessity, on an ancillary or supplementary basis"[44] and that "the kinds of services that may be provided include...aural messages [and] audio signals...on a broadcast basis...that do not derogate DTV broadcast stations' [video programming] obligations."[45]

Their proposal, which was eventually adopted, involves a "hybrid" technical solution of reducing the digital TV bandwidth allowing the analog FM 87.7 audio carrier to exist beside it - by using separate transmit equipment to provide each signal.[46] By authorizing this approach, the Commission was effectuating new FM 87.7 radio operations, not "grandfathering" existing services as the dismissal letter purports to be the case.[5]

Because a supplementary service must satisfy the public interest standard independent of the service to which it may be attached, FM 87.7 clearly comports with the Commission's "frequency allocation framework" - and to the extent that it does not cause interference, would do so regardless of location, licensee, or service class.

The Commission also acknowledged that the public cannot differentiate between a "supplementary" FM6 facility and a so-called "traditional" FM radio station, likely because they are technically indistinguishable.[47]

Therefore, the notice-and-comment rulemaking process ran its course - Indeed, there were advocates from both sides of the subject, but the record overwhelmingly supported FM 87.7 and the Commission decided as such.[14]

The letter also claims that "WHKA argues that a waiver is warranted because...LPFM service generally is in the public interest" which "is applicable to all LPFM applicants and therefore not...relating to the application."[48]

Although WHKA supports that LPFM service generally is in the public interest, the dismissal letter misplaces this position in relation to the waiver request. More accurately, the proposed station distinctly satisfies the standard because FM channel 199 was applied for in the original application, not at some other juncture.

The Commission's prior and current authorizations to use FM channel 200 (87.9 MHz) since 1978, and to use FM channel 199 (87.7 MHz) (officially) since 2023 therefore "christens" these two channels as being bona fide frequencies in the FM broadcast band - and affirms that radio operations using them serves the public interest.

Furthermore, the FM broadcast band is defined in statute as including both 87.7 and 87.9 MHz[49] and the LCRA

---

[44] 47 CFR 74.790(i), citing 73.624(c)

[45] 47 CFR 73.624(c)

[46] See: Venture Technologies Group, Inc. et al., *Ex Parte* Presentation (Docket No. 03-185 - June 2019) (Venture Presentation) at pg. 15 et seq., See also: Preserve Community Programming Coalition, Comments (Docket No. 03-185 - January 2020) at exh. B and Reply Comments (Docket No. 03-185 - February 2020) at exhs. A and B, See also, generally: FM6 Fifth Notice of Proposed Rulemaking at par. 14 et seq.

[47] FM6 Fifth Report and Order at par. 55 ("As a practical matter, we agree that listeners are not necessarily able to distinguish between an FM6 LPTV station's FM operations and a traditional FM station.")

[48] Dismissal Letter at pgs. 1 and 2

[49] *Preventing Illegal Radio Abuse Through Enforcement Act* (116th Congress - January 2020) (PIRATE Act) as codified at 47 USC 511 ("[FM] spectrum frequencies between...87.7 and 108 megahertz, inclusive")

does not specify or prohibit a specific spectrum range for the operation of LPFM (or full-service FM) stations.[50]

WHKA did not, consequently, err in its judgement to apply for a frequency which would not cause interference to other spectrum users - one present on every radio receiver, supported by both precedent and common sense.[51]

The LCRA also mandates that the Commission, when considering licensing new LPFM stations, "ensure that...such decisions are made based on the needs of the local community."[52]

In Connecticut, Tolland County and the adjacent Northeast Planning Region (County) are considered a "media desert" with no local newspapers[53] - and hardly any coverage from other outlets. Storrs-Mansfield is just one small community in this 15-odd-town region, aptly named the "Quiet Corner", characterized by its rural charm.

It is actually with great respect toward the Commission's frameworks and rules that WHKA seeks to operate on FM 87.7 - to be a responsible spectrum user while providing a valuable radio facility. Denying this underserved populace one of its only prospects to gain a new FM station is neither fair nor efficient nor an equitable distribution of radio service - and is contradictory to the Commission's creed, the LCRA, and the 1934 Act.[54]

To quote the Commission themselves, specifically in regard to allowing FM stations to use an alternate channel:

> So long as adequate protective measures are taken, there is nothing to be gained by not using the spectrum which is available. The demand is there, and this frequency can help meet it.[55]

The same notion clearly applies to WHKA's application.

WHKA's proposal stands as the only non-deficient LPFM application in the region to date[56] and is an example of just one way these community needs can be served - through a reliable broadcast resource that will advance the educational and charitable ideals of the Storrs-Mansfield, CT community without commercial motives.[57]

WHKA trusts the Commission to be a responsible agency, and implores it to act in good conscience - reinstating our application for a much-needed facility and, in doing so, serving the public interest and LPFM service goals.

---

[50] See also: 47 CFR 2.100, citing 2.105 and 2.106 at pg. 20 (Both the United States and ITU Region 2 tables of allocations permit "broadcasting" for the band including 87.7 MHz - not specifying discrete services)

[51] If WHKA had applied for an irreceivable frequency or one in violation of interference rules, the Commission's concerns may be justifiable. As explained herein, WHKA has made every attempt to be a responsible LPFM applicant.

[52] LCRA at sec. 5(2)

[53] See generally: *The State of Local News Report* (Local News Initiative, Northwestern University - 2023) at map, excepting the Daily Campus, a student-run newspaper exclusively covering the University of Connecticut.

[54] 1934 Act at sec. 307(b) ("In considering applications for licenses...the Commission shall make such distribution of licenses, frequencies, [etc.]...as to provide a fair, efficient, and equitable distribution of radio service.")

[55] 1978 Second Report and Order at par. 56

[56] See: Town of Somers (Application File No. BNPL-20131112BFK - December 2013) (The only other LPFM application ever filed to service either county, from the 2013 Second-Generation LPFM Filing Window, was dismissed.)

[57] LPFM Fourth Report and Order at par. 18

### Standing

WHKA has standing to bring forth this petition, pursuant to the Commission's regulations and the 1934 Act, which provide that "any person, whose interests are adversely affected by any action taken by the Commission or by their designated authority, may file a petition requesting reconsideration of the action taken."[58]

The pleading is timely filed, as it is before April 11th 2025, 30 days after public notice of the contested decision.[59]

### Resolution

An application proposing operation on FM 87.7 to satisfy the Commission's interference standards, such as ours, clearly <u>does not</u> undermine the Commission's "frequency allocation framework" or other rules. Reinstatement of the application, and subsequent acceptance, would serve the public interest, convenience, and necessity - and directly aligns with the LPFM service goals of facilitating new noncommercial educational radio service.

In furtherance of this petition, WHKA recommends the Commission approve the following resolution:

- Withdraw the decision rendered in the waiver request dismissal letter,

- Reinstate the above-captioned application for a new LPFM facility to provide noncommercial radio service to the Storrs-Mansfield, CT community, operating on FM channel 199 (87.7 MHz), as one that serves the public interest, convenience, and necessity,

- Accept the above-captioned application for filing as a non-deficient and technically qualified singleton and issue a public notice to that effect, and,

- If no pleadings are received or are otherwise resolved, therefore grant the above-captioned application.

Additionally, WHKA here exercises its privilege to recommend alternative resolution(s) as part of this petition:[60]

- Allow WHKA to propose the use of different technical parameters, including transmit site, to the extent that the Commission would be satisfied with the facility operating on FM channel 199, and-or,

- Accommodate WHKA as a qualified applicant for a Channel 6 TV facility alongside an FM6 radio operation, waiving prohibitive rules and putting into force the acceptance of WHKA's proposal as such.

WHKA appreciates the Commission and staff time and consideration regarding this matter.

Respectfully submitted,

Patrick Boots
Director, WHKA FM 87.7 Inc.

---

[58] 47 CFR 1.106(b)(1)

[59] *Actions* (Report No. PN-2-250312-01 - March 12th 2025)

[60] 47 CFR 1.106(d)(1) ("The petition shall state specifically the...relief sought and...may contain alternative requests.")



# Federal Communications Commission
Washington, D.C. 20554

May 23, 2025

**In Reply Refer to:**
1800B3-CEG

WHKA FM 87.7 Inc.
Attn: Patrick Boots, Director
1206 Storrs Rd No. 300
Storrs-Mansfield, CT 06268

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUN 24 2026

RECEIVED

Re:   **WHKA FM 87.7 Inc.**
New LPFM, Storrs-Mansfield, Connecticut
Facility ID No. 788033
Application File No. 233185

**Petition for Reconsideration**

Dear Applicant:

We have before us a petition for reconsideration (Petition) filed by WHKA FM 87.7 Inc. (WHKA) on April 3, 2025.[1] WHKA seeks reconsideration of the Audio Division, Media Bureau's (Bureau) dismissal of the above-referenced application (Application) for a new low power FM (LPFM) station at Storrs-Mansfield, Connecticut (Station).[2] The Application was dismissed for failure to specify a valid FM broadcast radio operating channel.[3] For the reasons set out below, we deny the Petition.

**Background.** The Application was filed on December 15, 2023, during the 2023 new LPFM filing window.[4] In the Application, WHKA specified an operating frequency of 87.7 MHz, which is within the 6 MHz frequency band allocated to broadcast television Channel 6 (TV6) (the TV6 frequency band is 82-88 MHz). WHKA requested a waiver (Waiver Request) to operate within the TV6 frequency band on the bases that: (1) there are no open FM band frequencies for new LPFM stations in its local area;[5] (2) LPFM service is in the public interest;[6] (3) a limited number of low power television (LPTV) Channel 6 licensees have been authorized to broadcast grandfathered FM radio service on 87.75 MHz (LPTV FM6 operations);[7] and (4) certain Class D NCE FM stations may be authorized to operate on FM

---

[1] Pleading File No. 268930.

[2] *See WHKA FM 87.7 Inc.,* Letter Decision, Application File No. 233185, Attach. entitled "2025-03-10 WHKA Waiver.pdf" (MB Mar. 10, 2025) (*Dismissal Letter*). The *Dismissal Letter* was placed on public notice on March 12, 2025. *Actions,* Public Notice, Report No. PN-2-250312-01 (MB Mar. 12, 2025).

[3] *Dismissal Letter* at 1.

[4] *See generally, Media Bureau Announces Filing Procedures and Requirements for November 1 – November 8, 2023, Low Power FM Filing Window,* Public Notice, 38 FCC Rcd 6660 (MB 2023) (*Procedures Public Notice*). Based on a request from LPFM advocates, the Bureau subsequently delayed the window until December 6, 2023. *Media Bureau Announces Revised Dates for LPFM New Station Application Filing Window,* Public Notice, 38 FCC Rcd 9589 (MB 2023). The Bureau subsequently extended the close of the window until December 15, 2023. *Media Bureau Announces Extension of LPFM New Station Application Filing Window,* Public Notice, 38 FCC Rcd 11882 (MB 2023).

[5] *See* Application, attachment entitled "WHKA FM 87.7 – Requests for Waiver of Rule.pdf" (uploaded Dec. 6, 2023) (Waiver Request) at 1. WHKA also refers to 87.7 MHz as "Channel 199."

[6] *Id.*

[7] *Id.; see generally, Amendment of Parts 73 and 74 of the Commission's Rules to Establish Rules for Digital Low Power Television and Television Translator Stations,* Fifth Report and Order, 38 FCC Rcd 6975, 6980, para. 8 (2023) (*Fifth LPTV Order*); 47 CFR § 74.790(o).

channel 200 (87.9 MHz) within the TV6 band if no other commercial frequencies are available.[8]

On March 10, 2025, the Bureau denied the Waiver Request, finding that WHKA had not cited special circumstances that would justify waiver and approval of its requested operation in the TV6 band. Specifically, the Bureau observed that the local unavailability of FM band frequencies and the overall public interest benefits of the LPFM service are not specific to WHKA but could apply to many LPFM stations.[9] The Bureau expressed concerns that such operation could interfere with TV6 band operations and undermine the integrity of the Commission's frequency allocations framework. The Bureau also distinguished WHKA's proposal from other FM broadcast operations in the TV6 band (LPTV FM6 operations and Channel 200 (87.9 MHz) Class D NCE stations) on the basis that these other uses were authorized through the notice-and-comment rulemaking process (not undertaken through individual waiver requests), subject to strict eligibility limitations, and intended to preserve existing service that would otherwise be lost due to regulatory changes.[10] For these reasons, the Bureau denied the Waiver Request and dismissed the Application for failure to specify a valid FM broadcast radio operating channel.

On April 3, 2025, WHKA filed the Petition. In the Petition, WHKA reiterates that it should be allowed to operate on 87.7 MHz because of the two aforementioned authorized FM broadcast operations on the TV6 band—namely, LPTV FM6 operations on 87.75 MHz and Class D NCE operations on 87.9 MHz. When the Commission authorized these uses, WHKA asserts, it "christen[ed] these two channels as being bona fide frequencies in the FM broadcast band – and affirm[ed] that radio operations using them serves the public interest."[11] There is no need for a rulemaking to additionally allow LPFM stations in the TV6 band, according to WHKA, because the public interest implications of such operation was fully considered in the proceeding authorizing LPTV FM6 operations.[12] WHKA contends that LPFM stations are: (1) "purposively equivalent" to Class D NCE stations in that they both serve small areas;[13] (2) "technically indistinguishable" from LPTV FM6 facilities "save for a lower power";[14] and (3)

---

[8] Waiver Request at 1 (citing 47 CFR § 73.512(a)(2)). Such operation is not allowed, however, if the proposed Class D NCE station would be within 250 miles of the Canadian border or would cause interference to a TV6 station or an FM station operating on FM channels 201, 202, or 203. 47 CFR § 73.512(a)(2).

[9] *Dismissal Letter* at 2-4 (citing *Birmingham Christian Radio, Inc. and Radio South Inc.*, Memorandum Opinion and Order, 18 FCC Rcd 7909, 7915, para. 19 (2003) (finding that market definitions are more appropriately addressed in a rulemaking proceeding); *Sunburst Media LP and Clear Channel Broadcasting Licenses, Inc.*, Memorandum Opinion and Order, 17 FCC Rcd 1366, 1368, para. 6 (2002) ("[I]t has long been Commission practice to make decisions that alter fundamental components of broadly applicable regulatory schemes in the context of rulemaking proceedings, not adjudications"); *Great Empire Broadcasting, Inc.* 14 FCC Rcd 11145, 11148, para. 8 (1999) ("It is generally inappropriate to address arguments for a change in rules where third parties, including those with substantial stakes in the outcome, have had no opportunity to participate, and in which we, as a result, have not had the benefit of a full and well-counseled record.") (internal citations omitted)).

[10] *Dismissal Letter* at 3.

[11] Petition at 7.

[12] *Id.* at 6-7 (citing MB Docket 03-185).

[13] *Id.* at 6 (citing *Changes in the Rules Relating to Noncommercial Educational FM Broadcast Stations,* Second Report and Order, 69 FCC.2d 240, 244, para. 11 (1978)).

[14] *Id.* at 3-4, 7.

"statutorily equivalent" to the one Class D translator operating on Channel 200.[15] Therefore, according to WHKA, any operation on 87.7 MHz "comports with the Commission's 'frequency allocation framework' – and to the extent that it does not cause interference, would do so regardless of location, licensee, or service class."[16]

In addition to its arguments by analogy to existing FM broadcasting on the TV6 spectrum, WHKA claims that its proposed facility will "not cause harmful interference to any other broadcast facility"[17] and "satisfies the Commission's rules regarding interference protection for LPFM stations to adjacent FM channels, translator and booster inputs, as well as 'co-channel' Channel 6 TV stations."[18] In response to the Bureau's observation that WHKA cannot satisfy the requirements of section 73.512(a)(2) because it is not a Class D NCE station and is within 250 miles of the Canadian border,[19] WHKA argues that it does not violate the terms of the treaty that section 73.512(a)(2) implements—the *U.S. – Canada Working Arrangement*.[20] Finally, WHKA reiterates its earlier arguments that there are no available FM band channels in the local area and that waiver would enable it to serve the "underserved" community of Storrs-Mansfield, Connecticut.[21] For these reasons, WHKA urges the Bureau to take one of the following courses of action: (1) reinstate the Application and grant the Waiver Request; (2) reinstate the Application and allow WHKA to amend to change its proposed technical parameters while remaining on 87.7 MHz;

---

[15] *Id.* at 6 (citing Local Radio Community Act of 2010 (LCRA), Pub. L. No. 111-371, 124 Stat. 4072 (2011) (providing that LPFM and FM translator stations are both secondary services and are "equal in status")). The sole FM translator operating in the TV6 band, K200AA, Sun Valley, Nevada, rebroadcasts NCE Class C0 station KAWZ, Twin Falls, Idaho.

[16] *Id.* at 7.

[17] *Id.* at 2.

[18] *Id.* at 4 (citing Application, Attachment entitled WHKA FM 87.7 - Comprehensive Technical Statement.pdf (Engineering Exhibit)). Specifically, WHKA states that it satisfies the distance separation requirements of 47 CFR §§ 73.825(b) (establishing spacing requirements for LPFM stations and TV6 LPTV stations operating on FM channels 201–220) and 74.1205(c) (establishing contour overlap requirements for noncommercial educational FM translator stations operating on FM channels 201–220 with respect to TV6 stations) with respect to WNYZ-LD, New York, NY. WHKA also argues that it satisfies 47 CFR §§ 73.825 (providing that LPFM stations on Channels 201 through 220 must either meet spacing requirements or submit a written agreement between the LPFM applicant and each affected TV6 broadcast station concurring with the proposed LPFM facilities) and 74.1205(c) with respect to WVCC-LD, Westmoreland, New Hampshire (WVCC). *See also Amendments of Parts 73 and 74 to Improve the Low Power FM Radio Service Technical Rules*, Report and Order, 35 FCC Rcd 4115, 4128 para. 35 (2020) (allowing LPFM applicants seeking short-spacing waivers to TV6 stations to make a contour overlap showing using the contour protection requirements set out in 47 CFR § 74.1205(c)).

[19] *Dismissal Letter* at 3.

[20] Petition at 5-6 (citing *Working Arrangement for the Allotment and Assignment of FM Broadcasting Channels under the Agreement between the Government of Canada and the Government of the United States of America Relating to the FM Broadcasting Service*, available at https://www.fcc.gov/broadcast-agreements-canada (executed in 1991, amended in 1997) (*U.S. – Canada Working Arrangement*)). WHKA also contends that the proposed station should not be "any cause for international concern" as another station assigned to 87.7 MHz was approved through the international coordination process. Petition at 6. Finally, WHKA objects to the Bureau's statement that "not only is [WHKA's proposed] station not a Class D FM station, but, due to treaty restrictions, Channel 200 is not available for any station located within 250 miles of the Canadian border, which includes Storrs-Mansfield, Connecticut." Petition at 5. This statement refers to the Station's ineligibility to operate on Channel 200 under 47 CFR § 73.512(a)(2) and is not an analysis of WHKA's overall direct compliance with the *U.S. – Canada Working Arrangement*, which we need not address here because we affirm the dismissal of the Application on other grounds.

[21] Petition at 2, 8.

or (3) license WHKA as a Channel 6 TV facility with approved FM6 operations.[22]

**Discussion.** We deny the Petition. The Commission will consider a petition for reconsideration only when the petitioner shows either a material error in the Commission's original order or raises additional facts not known or existing at the time of the petitioner's last opportunity to present such matters.[23] A petition for reconsideration that simply reiterates previously considered arguments will be denied, and arguments raised for the first time will be considered only if they are based on changed circumstances or additional facts not known or existing at the time of petitioner's last opportunity to present such matters, or if consideration of such arguments is required to serve the public interest.[24] Here, WHKA does not demonstrate a material error in the *Dismissal Letter* and does not raise additional facts not known or existing at the time of the petitioner's last opportunity to present such matters.

In the *Dismissal Letter*, the Bureau found that WHKA did not meet the standard for a waiver of the Commission's Rules to allow it to operate in the TV6 band. The Rules may be waived for good cause shown.[25] When an applicant seeks waiver of a rule, it must plead with particularity the facts and circumstances which warrant such action.[26] The Commission must give waiver requests "a hard look," but an applicant for waiver "faces a high hurdle even at the starting gate"[27] and must support its waiver request with a compelling showing.[28] Waiver is appropriate only if both (1) special circumstances warrant a deviation from the general rule, and (2) such deviation better serves the public interest.[29]

We again reject WHKA's argument that the Waiver Request is justified by reference to existing FM radio operations in the TV6 band. First and most importantly, this argument applies broadly to all LPFM applicants and therefore cannot, as we explained in the *Dismissal Letter*, form the basis of a waiver in an individual adjudication.[30] We remain unpersuaded that the LPFM service is technically, functionally, or statutorily equivalent to LPTV FM6 operations or Class D NCE stations such that the rules or policy considerations applicable to one service should extend by analogy to the other—in fact, such reasoning would effectively eviscerate the distinct regulatory regimes applicable to these different

---

[22] *Id.* at 9.

[23] 47 CFR § 1.106(c), (d); *WWIZ, Inc.,* Memorandum Opinion and Order, 37 FCC 685, 686 (1964).

[24] 47 CFR § 1.106(c); *Saga Communications of Illinois, LLC,* Memorandum Opinion and Order, 26 FCC Rcd 5958, 5959, para. 7 (MB 2011) (rejecting an argument from a petition for reconsideration because it did not raise any new information reflecting changed circumstances, did not present additional facts not know at the time of the last filing, and did not attempt to show anything more than a disagreement with the Commission's finding).

[25] 47 CFR § 1.3.

[26] *WAIT Radio v. FCC,* 418 F.2d 1153, 1157, para. 2 (D.C. Cir. 1969) (*WAIT Radio*).

[27] *Id.* at 1157, para. 2.

[28] *Greater Media Radio Co., Inc.,* Memorandum Opinion and Order, 15 FCC Rcd 7090, 7094, para. 9 (1999) (citing *Stoner Broadcasting System, Inc.,* Memorandum Opinion and Order, 49 FCC 2d 1011, 1012 (1974)).

[29] *NetworkIP, LLC v. FCC,* 548 F.3d 116, 125-128 (D.C. Cir. 2008) (citing *Northeast Cellular Telephone Co.,* 897 F.2d 1164, 1166 (1990)).

[30] *See, e.g., Sunburst Media L.P.,* Memorandum Opinion and Order, 17 FCC Rcd 1366, 1368, para. 6 (2022); *see also Community Television of Southern California v. Gottfried,* 459 U.S. 498, 511 (1983) ("[R]ulemaking is generally better, fairer, and more effective method of implementing a new industry-wide policy than the uneven application of conditions in isolated [adjudicatory] proceedings.").

types of FM service.[31] WHKA mistakenly assumes that the existence of certain limited FM operations in the TV6 spectrum constitute a blanket pre-approval or public interest justification for other assignments to the TV6 band. Rather, as explained in the *Dismissal Letter*, we cannot and will not extend the rules and policies governing LPTV FM6 operations or Class D NCE operations, which are specific to those services, to an LPFM station in the context of a waiver request that lacks any special circumstances justifying such an action. Importantly, when the Commission authorized LPTV FM6 operations or Class D NCE operations, it placed stringent limits on these allowed uses and expressly rejected the idea of any expansion of FM radio service in the TV6 spectrum based on these limited use categories.[32] Further, we reaffirm our determination that a lack of local channel availability is not a special circumstance because many LPFM applicants in densely populated areas could similarly have difficulty locating an available FM frequency.[33] Finally, WHKA's argument that it would not cause interference to other broadcast stations—even without reaching the issue of its asserted compliance with various rule provisions that do not apply to its requested frequency[34]—would be equally applicable to any LPFM station in its situation and therefore cannot be said to constitute special circumstances supporting a waiver request.

**Conclusion/Actions.** For the reasons stated above, **IT IS ORDERED** that the petition for reconsideration filed by WHKA FM 87.7 Inc. on April 3, 2025, Pleading File No. 268930, **IS DENIED**.

Sincerely,

Albert Shuldiner
Chief, Audio Division
Media Bureau

---

[31] To the extent that WHKA argues that it should be allowed to operate in the TV6 band because there is an FM translator licensed in that band, we note that LCRA's "equal in status" requirement does not mandate identical licensing procedures for LPFM and FM translator stations. *See, e.g., Foundation for a Beautiful Life, Inc.*, Memorandum Opinion and Order, 36 FCC Rcd 15933, 15945-46, paras. 16-17 (2021).

[32] *Changes In The Rules Relating To Noncommercial Educational FM Broadcast Stations*, Second Report and Order, 69 FCC.2d 240, 259, para. 59 (1978) ("[W] we will use Channel 200 exclusively in the manner described and will limit stations to their present facilities"); *Fifth LPTV Order*, 38 FCC Rcd at 7006, para. 61 (rejecting a plan to allow additional FM radio stations in the TV6 spectrum: "We find that the record does not support such a plan to remove a portion of the remaining spectrum allotted for television use and converting it to radio use.").

[33] *Dismissal Letter* at 2. We note that lack of channel availability *is* a prerequisite under 47 CFR § 73.512(a)(2) for a Class D station seeking an assignment to Channel 200. The difference is that section 73.512(a)(2) is a rule of general applicability and therefore is not limited to special circumstances.

[34] In the *Dismissal Letter*, we declined to consider WHKA's request for waivers of sections 73.825 and 74.1205(b) of the rules to allow it to be short-spaced to WVCC. Waiver Request at 1-3 (citing 47 CFR §§ 73.825 and 74.1205). We noted that sections 73.825 and 74.1205 do not set out spacing requirements for the requested frequency of 87.7 MHz and therefore there is no applicable spacing requirement to waive. Because we dismissed the Application on another ground, we did not reach the issue of what WHKA's spacing requirement would be for its specified frequency and subsequently whether to waive such a requirement. *Dismissal Letter* at 1, n.2.

In the matter of:

WHKA FM 87.7 Inc.
New LPFM, Storrs-Mansfield, CT

Facility No. 788033
Application File No. 233185



To:   Marlene Dortch, Office of the Secretary
      Erin Boone, Office of the Bureau Chief, Media Bureau

JUN 24 2026

## APPLICATION FOR REVIEW   RECEIVED

WHKA FM 87.7 Inc. (WHKA) here respectfully submits an Application for Review (Review) of the decision denying a Petition for Reconsideration concerning the dismissal of the above-captioned application for a new Low Power FM (LPFM) facility, operating on FM channel 199 (87.7 MHz), through a request for waiver of rule.[1]

WHKA's petition was denied on May 23rd 2025 via electronic mail notice from Keith Coburn, Broadcast Program Assistant, including a letter attributed to Albert Shuldiner, Chief of the Audio Division (Petition Denial Letter).[2]

The Audio Division's decision to deny the petition is substantively flawed, having been made in conflict with statute, regulation, and precedent - and fails to meaningfully engage with the questions of fact presented.

### *Overview*

It is well-proven that WHKA's application for a new LPFM facility within the Commission's Third-Generation LPFM Filing Window[3], filed on December 15th 2023, was both timely and a non-deficient singleton proposal.[4]

WHKA proposes this new service to serve the Storrs-Mansfield, CT community. Unfortunately, exclusively relying on the current interference protection approach would apparently result in no available so-called "traditional" frequencies for new LPFM service in Connecticut. Therefore, WHKA requested a waiver of rule to operate on a channel that would not cause interference to other users - FM channel 199 (87.7 MHz) or "FM 87.7."[5]

In the past, the Commission has authorized many facilities to operate analog radio services on FM 87.7[6], and has

---

[1] See: Petition for Reconsideration (Pleading Reference No. 268930)

[2] Petition Denial Letter from Albert Shuldiner (Reference No. 1800B3-CEG - May 23rd 2025)

[3] Media Bureau Announces Filing Procedures and Requirements for the November 1st-November 8th 2023 Low Power FM Filing Window  (DA 23-642 - July 31st 2023) et seq. and Media Bureau Announces Extension of LPFM New Station Application Filing Window  (DA 23-1150 - December 11th 2023) (2023 LPFM Filing Window Notice and Extension)

[4] Media Bureau Identifies Groups of Mutually Exclusive Applications Submitted in the December 2023 LPFM Filing Window  (DA 24-256 - March 15th 2024) (2023 LPFM Filing Window MX Notice)

[5] See: Application attachment entitled "Requests for Waiver of Rule" (Waiver Request)

[6] Amendment of Parts 73 and 74 to Establish Rules for Digital Low Power Television and Television Translator Stations, Fifth Report and Order (Docket No. 03-185 - FCC 23-58 - July 2023) (FM6 Fifth Report and Order) at par. 8

1

allowed noncommercial stations to use FM channel 200 (87.9 MHz) if they are in the "special circumstance" of being unable to find a suitable operating frequency[7] - providing, in both cases, that no interference is caused.

The Audio Division dismissed the application and waiver request on March 10th 2025.[8] The dismissal, "for failure to specify a valid FM broadcast radio operating channel,"[9] was made in a perfunctory manner and under false pretenses. Thus, WHKA filed an appropriate Petition for Reconsideration to reinstate the application.[1]

On May 23rd 2025, WHKA received the petition denial letter from the Audio Division stating:

> WHKA does not demonstrate a material error in the Dismissal Letter and...we again reject WHKA's argument that the Waiver Request is justified by reference to existing FM radio operations in the TV6 band.
> ...
> We deny the petition.[10]

Simply, the Audio Division's ruling was made in error and should be reversed. WHKA is and always has been a responsible applicant and petitioner - and did, in fact, demonstrate material errors in the original letter decision.

Therefore, WHKA respectfully requests that the full Commission grant this Application for Review, reverse the Bureau's petition denial, and direct the restoration and successful processing of WHKA's application and waiver.

## Review

The Commission's authority to license and regulate broadcast stations is derived from the necessity to manage spectrum scarcity and prevent harmful interference under the 1934 Act.[11] If no harmful interference will result from a proposed service, the statutory justification for dismissal then has considerably diminished relevance.

In such cases, the Commission must give serious consideration to the public interest implications of licensing decisions and may not rely solely on procedural rigidity or categorical rules to avoid a meaningful review.[12]

The Commission's rules are not absolute mandates - rather, they are policy instruments intended to implement and advance the public interest. Accordingly, the rules may be waived by the FCC themselves or by request when the application of the rule would be inequitable, unnecessary, or contrary to that very public interest.[13]

---

[7] *Changes in the Rules Relating to Noncommercial Educational FM Broadcast Stations*, Second Report and Order (Docket No. 20735 - FCC 78-384 - June 1978) (1978 Second Report and Order) at par. 26 and 51 et seq. and as codified at 47 CFR 73.512(a)(2) ("If a commercial channel is unavailable, to the extent possible each applicant should propose operation on FM channel 200 [87.9 MHz]")

[8] Waiver Request Dismissal Letter from Albert Shuldiner (Reference No. 1800B3-CEG - March 10th 2025)

[9] Dismissal Letter at pg. 3

[10] Denial Letter at pg. 4

[11] *Communications Act of 1934* (73rd Congress - June 1934) (1934 Act) at sec. 303 ("The Commission, from time to time as the public convenience, interest, or necessity requires, shall...make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations")

[12] *United Church of Christ vs. FCC* (359 F 2d 994 - 1966) (Finding that the public interest requires a balancing of the benefits and harms of regulatory action or inaction, particularly where technical compliance is undisputed.)

[13] 47 CFR 1.3 ("*Any* provision of the rules may be waived by the Commission on its own motion or on petition if good cause therefor is shown.") and *WAIT Radio vs. FCC* (418 F 2d 1153 - 1969) (WAIT Radio Case) ("That an agency may

2

In the instant case, WHKA requested a waiver of the following rules in regard to transmission frequency:

- **47 CFR 73.310 - FM technical definitions:** Slightly inaccurately defining "FM broadcast band" as "the band of frequencies extending from 88 to 108 MHz"

- **47 CFR 73.805 - Availability of [LPFM] channels:** Establishing that "all of the frequencies listed in 73.201...are available for LPFM stations" (but not excluding channels except for those provided in 73.220)

- **47 CFR 73.201 - Numerical designation of [commercial] FM broadcast channels:** Table of frequencies for 100 channels of a 200 kHz bandwidth each between 88.1 Mc/s and 107.9 Mc/s [sic]

- **47 CFR 73.501 - Channels available for [noncommercial] assignment:** Providing that frequencies between <u>87.9 MHz</u> and 91.9 MHz are reserved for noncommercial educational FM broadcasting

- **47 CFR 73.512 - Special procedures applicable to Class D noncommercial educational stations:** Allowing "low power" (Class D) FM stations to use FM channel 200 if they are in the "special circumstance" of being unable to find a suitable operating frequency in the "commercial band"

and in regard to Channel 6 TV distance separation:

- **47 CFR 73.825 - [LPFM] protection to reception of TV channel 6:** Table of spacing requirements between LPFM stations and Channel 6 TV stations "unless the application is accompanied by a written agreement between the LPFM applicant and each affected TV Channel 6 broadcast station concurring with the proposed LPFM facilities."

- **47 CFR 74.1205 - [FM translator] protection of channel 6 TV broadcast stations:** Allowing the use of contour separation-based protection for noncommercial translators, which is allowable for LPFM applications requesting a waiver[14]

When an applicant seeks a waiver of rule, it must plead with particularity the circumstances which warrant such action, and provide "adequate reasons why the rules should be waived."[15] WHKA <u>has</u> met this burden.

In turn, the Commission is obligated to give such requests a "hard look" and may not dismiss them through rigid application of its rules.[16] It is clear that the Audio Division gave, at best, a "soft look" of WHKA's waiver request.

The affirmation that "a lack of local channel availability is not a special circumstance because many LPFM applicants in densely populated areas could similarly have difficulty locating an available FM frequency"[17] fails to consider the actual process an LPFM applicant must follow to assess spectrum availability and prepare a compliant application - and attempts to diminish the significant technical, logistical, and legal burdens involved.

---

discharge its responsibilities by promulgating rules of general application...does not relieve it of an obligation to seek out the public interest in particular, individualized cases.") (emphasis added)

[14] *Amendments of Parts 73 and 74 to Improve the Low Power FM Radio Service Technical Rules*, Report and Order (Docket No. 19-193 - FCC 20-53 - April 2020) (LPFM Technical Order) at par. 35 ("LPFM applicants could make...a showing using the FM translator TV6 contour protection requirements of section 74.1205(c).")

[15] WAIT Radio Case at par. 2, citing *Rio Grande Family Radio Fellowship vs. FCC* (406 F 2d 664 - 1968)

[16] WAIT Radio Case at par. 2 ("[A request for waiver] accompanied by supporting data...must be given a 'hard look.'")

[17] Denial Letter at pg. 5

The "local channel availability" and distance separation requirements at a given location are interdependent factors. Indeed, certain areas may offer available channels for potential new service on paper, but all applicants are realistically bound to locations which are both considered "local" and at which they can site their facilities.[18]

It is true that an LPFM application at a given location which does not satisfy the distance separation rules will be dismissed without opportunity for amendment.[19] However, an applicant may request a channel waiver in its application filing if no interference would result to adjacent FM or Channel 6 TV stations despite the spacing.[20]

Although the Commission provides a tool to identify available frequencies for LPFM use, they disclaim its use by potential applicants[21] - and do not provide technical or legal assistance of any kind. Instead, they recommend that applicants hire "outside help"[22] even though "LPFM engineering requirements...were designed to be simple so that nonprofit organizations with limited engineering expertise and small budgets could readily apply."[23]

Importantly, the FM broadcast band is defined in statute as including both 87.7 and 87.9 MHz[24] and the LCRA does not specify or prohibit a specific spectrum range for the operation of LPFM (or full-service FM) stations.[25] While WHKA's petition gave due weight to these facts[26], the decisions seemingly gave them no consideration.

The Commission did not exclude Connecticut or WHKA's proposed service area from eligibility for new LPFM facilities, and WHKA's clear engineering analysis proved that FM 87.7 would then be the most suitable operating

---

[18] 47 CFR 73.853(b) ("Only local organizations will be permitted to submit applications and to hold authorizations in the LPFM service" with reference to the "proposed site for the transmitting antenna") and *Reexamination of the Comparative Standards and Procedures for Licensing Noncommercial Educational Broadcast Stations and Low Power FM Stations*, Report and Order (Docket No. 19-3 - FCC 19-127 - December 2019) ("An applicant...must have reasonable assurance that its specified site will be available for the construction and operation of its proposed facilities.")

[19] 47 CFR 73.870(c) ("Applications...that fail to meet the 73.807 minimum distance separations...will be dismissed without any opportunity to amend such applications.") and 2023 LPFM Filing Window Notice at pg. 4

[20] *Local Community Radio Act of 2010* (111th Congress - January 2011) (LCRA or 2010 Act) at sec.3(b)(2)(A) ("The Commission may grant a waiver of the second-adjacent channel distance separation requirement to low-power FM stations that establish...that their proposed operations will not result in interference to any authorized radio service.") and *supra* at n. 14, and 2023 LPFM Filing Window Notice at pg. 4, citing 47 CFR 73.807(e) ("An LPFM applicant seeking such a waiver must include its waiver request with its application *and* an engineering study demonstrating that its proposed station will not cause interference to any authorized radio service.") (emphasis original)

[21] 2023 LPFM Filing Window Notice at pg. 4 ("Applicants may use the Bureau's LPFM Channel Finder to help determine if a proposed transmitter site would meet minimum LPFM station spacing requirements...[but] there is no guarantee that channels represented as 'available' will be technically acceptable at the time an application is filed.")

[22] 2023 LPFM Filing Window Notice at pg. 4 ("An applicant should consider using a consulting engineer or a party familiar with the LPFM technical rules to determine the technical acceptability of its application, particularly if the applicant is requesting a second-adjacent channel spacing waiver.")

[23] *Amendments of Parts 73 and 74 to Improve the Lower Power FM Technical* Rules, Notice of Proposed Rulemaking (Docket No. 19-193 - FCC 19-74 - July 2019) (LPFM Technical Order) at par. 2, citing Creation *of a Low Power Radio Service*, Report and Order (Docket No. 99-25 - FCC 00-19 - January 2000) (LPFM Report and Order) at par. 4

[24] *Preventing Illegal Radio Abuse Through Enforcement Act* (116th Congress - January 2020) (PIRATE Act) as codified at 47 USC 511 ("[FM] spectrum frequencies between...87.7 and 108 megahertz, inclusive")

[25] See also: 47 CFR 2.100, citing 2.105 and 2.106 at pg. 20 (Both the United States and ITU Region 2 tables of allocations permit "broadcasting" for the band including 87.7 MHz - not specifying discrete services)

[26] Petition at pgs. 7 and 8

frequency. The unjust denial of WHKA's technically-qualified application frustrates the core purpose of the LPFM service: to expand local, noncommercial voices in communities underserved by other media outlets.[27]

The Bureau's contention that "[they] remain unpersuaded that the LPFM service is technically, functionally, or statutorily equivalent to LPTV FM6 operations or Class D NCE stations"[10] is misguided and unsupported by fact.

At its most basic, the FM radio signal is a form of electromagnetic radiation that transmits audio information by varying the frequency of the carrier wave - a technique known as frequency modulation.[28] The audio baseband signal in monaural FM broadcasting typically occupies 15 kHz of bandwidth[29] - other techniques exist to provide stereophonic sound and "sidecar" signals, which occupy extra spectrum.[30] In order to provide spacing between adjacent stations, the FCC has traditionally allocated 200 kHz of bandwidth per FM broadcast channel.[31]

While a given facility has inherent technical parameters - for example, transmit site, power, and center frequency - the actual signal being radiated would, in theory, be identical if broadcasting the same audio. Practically, a listener cannot differentiate between FM stations of different service classes nor FM6 facilities.[32] This is by design - to allow the public to use the same method to demodulate FM signals. Nearly every radio receiver sold in the last forty years, and many older models, have included the ability to tune to FM 87.7.[33] Indeed, FM has notably been used by NWS Weather Radio stations[34] and as part of the NTSC analog TV standard, which led to the technical coincidence that the audio carrier of Channel 6 TV stations fell at 87.7 MHz.[35]

As explained in the petition, "FM6" did not officially exist until 2023.[36] As part of those proceedings, the

---

[27] See, eg.: LPFM Report and Order at par. 4 ("Our goal in creating a new LPFM service is to create a class of radio stations designed to serve very localized communities or underrepresented groups within communities.")

[28] *Newton's Telecom Dictionary* (24th ed. - 2008) ("Frequency modulation: A modulation technique in which the carrier frequency is shifted by an amount proportional to the value of the modulating signal.") and 47 CFR 73.310(a)(17)

[29] 47 CFR 73.310(b)(5) ("Main channel: The band of frequencies from 50 to 15,000 Hz which frequency-modulate the main carrier.")

[30] See generally: 47 CFR 73.295, 73.319, and 73.322

[31] 47 CFR 73.310(a)(11) ("FM broadcast channel: A band of frequencies 200 kHz wide and designated by its center frequency.")

[32] FM6 Fifth Report and Order at par. 55 ("As a practical matter, we agree that listeners are not necessarily able to distinguish between an FM6 LPTV station's FM operations and a traditional FM station.")

[33] See generally: *Amendment of Parts 73 and 74 to Establish Rules for Digital Low Power Television and Television Translator Stations*, Fifth Notice of Proposed Rulemaking (Docket No. 03-185 - FCC 22-40 - June 2022) (FM6 Fifth Notice of Proposed Rulemaking) at par. 48 ("We note that FM radio receivers...receive...87.7 [and] 87.9 MHz")

[34] *All Hazards Receiver Consumer Information* (National Weather Service - weather.gov/nwr/nwr_receivers) ("[NWS Weather Radio] transmitters broadcast on one of seven VHF frequencies from 162.400 MHz to 162.550 MHz")

[35] FM6 Fifth Notice of Proposed Rulemaking at par. 3 et seq. (FM6 is also known by the colloquialism "Franken-FM.")

See also, generally: *Digital switch cost 6 ABC its radio audience* (Philadelphia Inquirer - July 2nd 2009) ("In a 'frequency fluke,' listeners could tune in to [WPVI] 6 ABC at 87.7 FM on car or home radios and listen to the audio portion of 6 ABC's shows") and *WRGB ends FM radio simulcast* (Albany Times-Union - August 26th 2009) ("The simulcast had been available for years at 87.7 FM, but it disappeared in June when television stations were mandated to end analog over-the-air broadcasting in favor of digital signals.")

[36] Petition at pgs. 3, 4, 6, and 7 (additional citations omitted)

Commission determined that FM 87.7 radio operations <u>do in fact</u> serve the public interest and are "analogous to ['traditional' FM radio] services."[37] By the Commission's own finding, to the extent that LPFM and FM6 stations both provide a standard FM radio signal and do not cause interference, they are "equivalent." As well, WHKA thoroughly refuted the Bureau's claims that FM6 services were "grandfathered" before they even existed.[38]

In the context of WHKA's application, the 14 FM6 facilities undeniably prove that an FM 87.7 radio station serves the public interest on a policy level and clearly <u>does not</u> disturb the FCC's "frequency allocation framework."[39]

Furthermore, LPFM and Class D FM stations are practically interchangeable - but each is a product of different eras in FCC policymaking and industry attitudes. Class D was established to allow noncommercial educational organizations to provide new "low power" radio service.[40] However, pressure from full-service broadcasters in the 1970s coerced the Commission to phase out new Class D licenses, force active stations from "primary" to "secondary" status and mandating frequency changes in order to accommodate more higher-powered stations.[41]

After years of unrest and the Telecommunications Act of 1996 loosening media consolidation rules, grassroots radio activists successfully petitioned the Commission to revisit the concept of a "low power" radio service. The creation of LPFM in 2000 effectively revived the original goals of Class D but under a new regulatory structure that reflected modern interference protections and a renewed interest in localism and media diversity.[42]

Both services provide less than the reference requirements for Class A service[43], are reserved for noncommercial educational licensees[44], and likewise enjoy "secondary" status.[45] It is clear they both serve the same "function."

"Low power" (Class D) stations in the "special circumstance" of being unable to find a suitable operating channel, as is the case with WHKA's proposed station - are allowed to use FM channel 200 (87.9 MHz).[7] The denial letter importantly concedes this[46] but claims that "the difference is that section 73.512(a)(2) is a rule of general applicability and therefore is not limited to special circumstances."[47]

Whether a rule at issue is one of general or limited applicability is irrelevant to the question of waiver.[13] We posit that 73.512(a)(2) implicitly reflects the presence of "special circumstances," given its extremely rare usage.

---

[37] FM6 Fifth Report and Order at par. 53-58 and as codified at 47 CFR 74.790(o), citing 47 USC 336(b)(3)

[38] Petition at pg. 7 ("By authorizing this ['hybrid'] approach, the Commission was effectuating new FM 87.7 radio operations, *not* 'grandfathering' existing services as the dismissal letter purports to be the case.") (emphasis original)

[39] Dismissal Letter at pg. 2

[40] 1978 Second Report and Order at par. 11 ("Low power 'Class D' stations are intended to serve limited areas as, for example, a college campus.")

[41] 1978 Second Report and Order at par. 24 et seq.

[42] See generally: LPFM Report and Order at par. 3 et seq. and *Introduction to LPFM* (REC Networks - recnet.com/lpfm)

[43] 47 CFR 73.211(a)(3)

[44] LPFM Report and Order at par. 1, and See generally: 47 CFR 73.512

[45] LPFM Report and Order at par. 4 and *supra* at n. 41

[46] Denial Letter at n. 33 ("We note that lack of channel availability *is* a prerequisite under 47 CFR 73.512(a)(2) for a Class D station seeking an assignment to Channel 200.") (emphasis original)

[47] Denial Letter at n. 33

The letter goes on to say "...when the Commission authorized...Class D NCE [FM channel 200] operations, it placed stringent limits on these allowed uses,"[17] with a footnote citing the 1978 Second Report and Order.[48] Critically, the complete paragraph from the original order was not considered. It reads:

> *At this point*, we are not in a position to assay the extent to which Channel 200 will be needed to accommodate Class D stations moved from their present frequencies. As a consequence, it is not yet possible to predict what space, if any, might remain for the *possible use of any new stations*.

> Therefore, *for the time being*, we will use Channel 200 exclusively in the manner described and will limit stations to their present facilities, which will not be allowed to exceed 50 watts effective radiated power and an antenna height of 30 meters (100 feet) *unless those greater facilities...would cause no interference [to Channel 6 TV or adjacent FM stations]*.[49]

The language here suggests that the Commission did not intend to perpetually restrict usage of FM channel 200 to existing stations, much less to just "purebred" Class D stations - and not with limiting technical parameters:

> We are convinced that the best use [for FM channel 200] is for stations with *modest, essentially Class D, facilities*.[50]

with a direct reference stating that the order's guidelines are intended for "Class D stations or equivalent."[51]

WHKA's proposed station is <u>unquestionably</u> a "modest, essentially Class D, facility," or "equivalent," and would not cause interference - therefore proving that waiver would "not undermine the policy underlying the rule."[52]

The denial letter notes that "the Bureau's statement [which maintains]...due to treaty restrictions, Channel 200 is not available for any station located within 250 miles of the Canadian border...refers to the Station's ineligibility to operate on Channel 200 under 47 CFR 73.512(a)(2) and is not an analysis of WHKA's overall direct compliance with the [1991 US-Canada FM Agreement]," but ignores multiple particulars brought forth in the petition.

WHKA accurately identified that 73.512(a)(2) incorrectly transcluded rules of the 1947 US-Canada Agreement when it was enacted.[53] However, that treaty was superseded - wholly - by the 1991 US-Canada FM Agreement.[54]

The record has long held that where a statute or treaty is superseded, derivative regulations that depend on it must be revised or invalidated unless re-justified.[55] There is no real reason for preventing usage of FM channel

---

[48] Denial Letter at n. 32, incompletely citing 1978 Second Report and Order at par. 59

[49] 1978 Second Report and Order at par. 59 (emphasis added)

[50] 1978 Second Report and Order at par. 58

[51] 1978 Second Report and Order at n. 26

[52] *Northeast Cellular Telephone Co. vs. FCC* (897 F 2d 1164 - 1990) ("Waiver is appropriate only if both 1. special circumstances warrant a deviation from the general rule, and 2. such deviation better serves the public interest [and will not undermine the policy underlying the rule].")

[53] Petition at pg. 5 ("The treaty the dismissal letter and rule part refer to, but do not cite, is one between the United States and Canada from 1947 - which was in effect when the rule was written in 1978.")

[54] *Working FM Agreement with Canada* (February 1991) (1991 US-Canada FM Agreement) at cover pg. 1 ("The new agreement between the two governments shall enter into force...and shall supersede the 1947 agreement.")

[55] See: *Motor Vehicle Manufacturers Association vs. State Farm* (463 US 29 - 1983) (finding agency action is arbitrary and capricious if it fails to account for changed circumstances or lacks a reasoned explanation)

200 specifically within 402 km (250 mi) of the common border - and as stated in the petition, the updated figure became 320 km (198 mi)[56], which is the basis of the international rules applicable to all LPFM stations anyway.[57]

WHKA has also independently concurred with engineering staff from the Radio Spectrum Management office at Industry Canada that our proposed facility would satisfy any international consideration for LPFM stations.[58]

In regard to FM 87.9, case study facility K200AA is also not a "true" Class D station, being an FM translator.[59]

WHKA refers in the petition to the LCRA's provision that LPFM and FM translator stations "remain equal in status and secondary to...full-service FM stations"[60] and since a noncommercial FM translator station operates on a so-called alternate channel, a similarly-situated LPFM station should not be precluded from doing the same.[61]

The denial letter purports that "the LCRA's 'equal in status' requirement does not mandate identical licensing procedures for LPFM and FM translator stations,"[62] but the Commission has held that the clause ensures "applications in one service will not foreclose or unduly preclude opportunities to file applications in the other."[63]

Allowing an FM translator to use an alternate channel but excluding an LPFM station is, then, a violation. Indeed, the LCRA also mandates that the Commission, when considering licensing new LPFM stations, "ensure that...licenses are available...[and] such decisions are made based on the needs of the local community."[64] WHKA has clearly and consistently demonstrated a community need for a new noncommercial radio station.[65]

The denial letter proclaims that "WHKA mistakenly assumes that the existence of certain limited FM operations in the TV6 spectrum constitute[s] a blanket pre-approval or public interest justification for other assignments to the TV6 band." However, this statement is incorrect and disparaging toward WHKA and its waiver request.

WHKA firmly stands by its position that the Commission's prior and current authorizations to use FM channel 200 (87.9 MHz), and to use FM channel 199 (87.7 MHz) therefore "christens" these two channels as being bona fide frequencies in the FM broadcast band - and affirms that operations using them serves the public interest.[66]

---

[56] Petition at pg. 5 and 1991 US-Canada FM Agreement at cover pg. 3 ("Assignments made at points which are more than 320 kilometres from the nearest point on the border...will normally have no international significance.")

[57] 47 CFR 73.807(g) ("International considerations within the border zones: Within 320 km of the Canadian border, LPFM stations must meet the following minimum separations with respect to any Canadian stations.")

[58] Correspondence with Mr. David Richard, Senior Broadcast Engineer for Industry Canada

[59] See generally: K200AA (Facility No. 83363) and 47 CFR 74.1201(a) ("FM translator: A station in the broadcasting service operated for the purpose of retransmitting the signals of an AM or FM radio broadcast station")

[60] Petition at pg. 6, citing LCRA at sec. 5(3)

[61] Petition at pg. 6, citing LPFM Fourth Report and Order and LPFM Third Further Notice

[62] Denial Letter at n. 31

[63] LPFM Technical Order at n. 15

[64] LCRA at sec. 5(1)-(2)

[65] See, eg.: Petition at pg. 8 ("In Connecticut, Tolland County and the adjacent Northeast Planning Region [County] are considered a 'media desert'" and "WHKA's proposal stands as the only non-deficient LPFM application in the region to date and is an example of just one way these community needs can be served") (additional citations omitted)

[66] Petition at pg. 7 and see *supra* at n. 24 and 25

The letter moreover says "[The Commission]...expressly rejected the idea of any expansion of FM radio service in the TV6 spectrum based on these limited use categories,"[17] referencing a proposal to re-allocate <u>irreceivable</u> TV Channel 6 frequencies, 82.1 to 87.5 MHz.[67] WHKA already addressed this point - since no other FM 87.7 radio operations were prohibited due to that proposal's rejection, it cannot be used to prevent our proposed service.[68]

At no point did we wish to suggest operations that would knowingly cause interference or to use an irreceivable frequency. In fact, WHKA has made every effort to be a responsible LPFM applicant, and have proven time and again that our proposed facility will provide a valuable service that is responsive and community-driven.[27]

To that end, we respectfully submit that the Commission has authorized facilities in the "TV Channel 6 band" that, by any reasonable measure, "look, swim, and quack" like radio stations.[69] It is arbitrary and capricious to deny WHKA access to the same electromagnetic spectrum, with an equivalent FM radio signal, on the basis of conjectural and theoretical distinctions that have realistically been operationally and regulatorily erased.

Even the denial letter's claim in regard to Channel 6 TV separation is questionable - that "[the Commission] cannot consider [WHKA's] request because sections 73.825 and 74.1205 do not set out spacing requirements for the requested frequency of 87.7 MHz and therefore there is no applicable spacing requirement to waive."[70]

WHKA's request was in reference to the clauses in both rules restricting applicable channels, not the spacing requirements. As noted in the original request and petition, WHKA's facility otherwise satisfies both rules.[71] Furthermore, because any affected Channel 6 TV station would be operating in digital mode, the probability of even slight interference from WHKA's station - even being a pseudo "co-channel" situation - is greatly reduced.

The lack of available "traditional" frequencies for new LPFM service in WHKA's case <u>is</u> a "special circumstance" allowing for waiver - since precedent recognizes that waiver is appropriate where the strict application of a rule would preclude service despite no technical barrier, and where the public interest would be better served.

WHKA respectfully reminds the Commission that they are under a "statutory obligation to authorize facilities in a manner that best serves the public interest,"[72] and that they must "make available to *all* the people of the United States, without discrimination...[an] efficient radio communication service,"[73] yes, <u>even</u> Low Power FM. That duty is not fulfilled if its provision for FM service is such as to make it impossible for distant areas - such as Storrs-Mansfield, CT - to enjoy satisfactory, local, noncommercial educational radio facilities like WHKA's.[74]

WHKA trusts the Commission to be responsible in its thorough review and urges it to act in the public interest.

---

[67] Denial Letter at n. 32, citing FM6 Fifth Report and Order at par. 61 et seq.

[68] Petition at n. 22 ("We did not propose to use [the 'rejected' irreceivable frequencies], so that point is irrelevant.")

[69] *Supra* at n. 6 and n. 32, See also, generally: *Black's Law Dictionary* (11th ed. - 2019) ("Duck test: A form of inductive reasoning - if something looks like a duck, swims like a duck, and quacks like a duck, then it probably is a duck.")

[70] Dismissal Letter at n. 2 and Denial Letter at n. 34

[71] Petition at pg. 4, citing Waiver Request at pgs. 2 and 3

[72] LPFM Report and Order at par. 1

[73] 1934 Act codified as amended at 47 USC 151 et seq. (emphasis added)

[74] See: *Allocation of Frequencies to the Various Classes of Non-Governmental Services in the Radio Spectrum* (Docket No. 6651 - 39 FCC 222 - 1945) at pg. 224

## Standing

WHKA has standing to bring forth this application, pursuant to the Commission's regulations, the 1934 Act, and the Administrative Procedures Act, which provide that "any person aggrieved by any action taken pursuant to delegated authority may file an application requesting review of that action by the Commission."[75]

The pleading is timely filed, as it is within June 28th 2025, 30 days after public notice of the contested decision.[76]

## Resolution

WHKA FM 87.7 Inc.'s application for a new LPFM facility proposing operation on FM 87.7 has been proven to be technically sound, would not cause harmful interference, and does not undermine the Commission's rules.

There is ample and compelling reasoning, with good cause shown herein, to grant WHKA's requests for waiver.

In furtherance of this application, WHKA respectfully requests the Commission accept the following resolution:

- Grant this application for review,

- Reverse the decisions rendered by the Media Bureau denying WHKA's petition for reconsideration,

- Direct the restoration and successful processing of the above-captioned application for a new LPFM facility to provide noncommercial radio service to the Storrs-Mansfield, CT community, operating on FM channel 199 (87.7 MHz), as one that serves the public interest, convenience, and necessity, and

- Accept the above-captioned application for filing as a non-deficient and technically qualified singleton, issue a public notice to that effect, and therefore grant the above-captioned application.

Additionally, WHKA here exercises its privilege to recommend alternative resolution(s) as part of this petition:[77]

- Allow WHKA to propose the use of different technical parameters, including transmit site, to the extent that the Commission would be satisfied with the facility operating on FM channel 199 or 200, and-or,

- Accommodate WHKA as a qualified applicant for a Channel 6 TV facility alongside an FM6 radio operation, waiving prohibitive rules and putting into force the acceptance of WHKA's proposal as such.

WHKA appreciates the Commission and staff time and consideration regarding this matter.

Respectfully submitted,

Patrick Boots
Director, WHKA FM 87.7 Inc.

---

[75] 47 CFR 1.115(a)

[76] *Pleadings* (Report No. PN-3-250528-01 - May 28th 2025)

[77] 47 CFR 1.115(b)(4) ("The application shall state the form of relief sought and...may contain alternative requests")

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| WHKA FM 87.7 Inc. | ) | |
| | ) | |
| Application for a Construction Permit for a | ) | Application File No. 233185 |
| New Low Power FM Station at | ) | Facility ID No. 788033 |
| Storrs-Mansfield, Connecticut | ) | |

**MEMORANDUM OPINION AND ORDER**

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

**Adopted: May 18, 2026**                                           **Released: May 19, 2026**

By the Commission:                    JUN 24 2026

## I.    INTRODUCTION       RECEIVED

1.      We have before us an application for review (Application for Review) filed by WHKA FM 87.7 Inc. (WHKA) on June 27, 2025.[1] WHKA seeks Commission review of a letter decision on reconsideration issued by the Audio Division, Media Bureau (Bureau) on May 23, 2025.[2] The *Reconsideration Letter* upheld the March 10, 2025, dismissal of the above-captioned application for a new low power FM (LPFM) station in Storrs-Mansfield, Connecticut (Application).[3] For the reasons stated below, we deny the Application for Review.

## II.    BACKGROUND

2.      WHKA filed the Application on December 15, 2023, during the 2023 new LPFM filing window.[4] In the Application, in lieu of an authorized FM band frequency, WHKA specified an operating frequency of 87.7 MHz, which is within the 6 MHz frequency band allocated to broadcast television

---

[1] Pleading File No. 274386.

[2] *WHKA FM 87.7 Inc.*, Letter Decision, Ref. No. 1800B3-CEG, Application File No. 233185 (MB May 23, 2025) (*Reconsideration Letter*).

[3] *WHKA FM 87.7 Inc.*, Letter Decision, Ref. No. 1800B3-CEG, Application File No. 233185 (MB March 10, 2025) (*Dismissal Letter*).

[4] *See generally Media Bureau Announces Filing Procedures and Requirements for November 1 – November 8, 2023, Low Power FM Filing Window*, Public Notice, 38 FCC Rcd 6660 (MB 2023) (*Procedures Public Notice*). Based on a request from LPFM advocates, the Bureau subsequently delayed the window until December 6, 2023. *Media Bureau Announces Revised Dates for LPFM New Station Application Filing Window*, Public Notice, 38 FCC Rcd 9589 (MB 2023). The Bureau subsequently extended the close of the window until December 15, 2023. *Media Bureau Announces Extension of LPFM New Station Application Filing Window*, Public Notice, 38 FCC Rcd 11882 (MB 2023). In the *Procedures Public Notice*, the Bureau announced that it would accept LPFM applications for the entire FM band (Channels 201-300) during the filing window. *See also* 47 CFR § 73.805 (providing that all of the frequencies in 47 CFR § 73.201 are available for LPFM stations).

Channel 6 (TV6 Band).[5] WHKA requested a waiver (Waiver Request) to operate within the TV6 Band.[6] WHKA justified the Waiver Request on the bases that: (1) there are no available FM band frequencies in its local area;[7] (2) its proposed LPFM station would not cause interference;[8] and (3) other FM service uses of the TV6 Band indicate that use of this spectrum by another FM service would be in the public interest.[9] Specifically, WHKA notes that the Commission has authorized low power television Channel 6 (LPTV FM6) licensees that were already broadcasting FM signals on Channel 199 (87.75 MHz) to continue to do so, with certain restrictions.[10] In addition, WHKA observes that certain Class D noncommercial educational (NCE) FM stations may be authorized to operate on Channel 200 (87.9 MHz) within the TV6 Band if no other commercial frequencies are available.[11]

3.    On March 10, 2025, the Bureau dismissed the Application for failure to specify a valid FM broadcast radio operating channel and denied the Waiver Request, finding that WHKA had not demonstrated special circumstances that would justify a waiver of the Commission's frequency allocation rules. In the *Dismissal Letter*, the Bureau observed that the local unavailability of FM band frequencies and the overall public interest benefits of the LPFM service are not specific to WHKA.[12] Given the potentially broad applicability of such a waiver, the Bureau expressed concerns that the proposal could lead to interference with other stations and compromise the integrity of the Commission's frequency allocations framework.[13] It distinguished WHKA's proposal from the two previously authorized FM broadcast operations in the TV6 band, explaining that these other uses had been authorized through

---

[5] WHKA specified an operating frequency of 87.7 MHz, which it also refers to as "Channel 199." Waiver Request at 1. The FM broadcast radio band is the band of frequencies extending from 88.1 MHz to and including 107.9 MHz and the TV6 frequency band is 82-88 MHz. *See* 47 CFR §§ 73.310(a)(10)-(11); 73.603.

[6] *See* Application, attachment entitled "WHKA FM 87.7 – Requests for Waiver of Rule.pdf" (uploaded Dec. 6, 2023) (Waiver Request). In the Application for Review, WHKA states that its proposed operation would require waiver of the following rules: 47 CFR §§ 73.310, 73.805, 73.201, 73.501, 73.512, 73.825, and 74.1205. Application for Review at 3. WHKA also requested waiver of the distance separation rules, which the Bureau declined to consider because it dismissed the application on other grounds. *See Dismissal Letter* at 1, n.2, *Reconsideration Letter* at 5, n.34.

[7] Waiver Request at 1.

[8] *Id.*

[9] *Id.* (referring to: (1) stations using FM channel 200 (87.9 MHz) under rules applicable to Class D stations at 47 CFR § 73.512 and (2) LPTV FM 6 operations).

[10] *Id.; see generally, Amendment of Parts 73 and 74 of the Commission's Rules to Establish Rules for Digital Low Power Television and Television Translator Stations*, Fifth Report and Order, 38 FCC Rcd 6975, 6980, para. 8 (2023) (*Fifth LPTV Order*) (permitting existing FM6 LPTV stations to continue to provide FM6 operations); 47 CFR § 74.790(o) (setting forth certain conditions for LPTV stations that provide FM6 radio service).

[11] Channel 200 is available only for use of existing Class D stations required to change frequency. 47 CFR § 73.501(a) n1. Such operation is not allowed if the proposed Class D NCE station would be within 250 miles of the Canadian border or would cause interference to a TV6 station or an FM station operating on FM channels 201, 202, or 203. 47 CFR § 73.512(a)(2)).

[12] *Dismissal Letter* at 2-4 (citing *Birmingham Christian Radio, Inc. and Radio South Inc.*, Memorandum Opinion and Order, 18 FCC Rcd 7909, 7915, para. 19 (2003) (finding that market definitions are more appropriately addressed in a rulemaking proceeding); *Sunburst Media LP and Clear Channel Broadcasting Licenses, Inc.*, Memorandum Opinion and Order, 17 FCC Rcd 1366, 1368, para. 6 (2002) ("[I]t has long been Commission practice to make decisions that alter fundamental components of broadly applicable regulatory schemes in the context of rulemaking proceedings, not adjudications"); *Great Empire Broadcasting, Inc.* 14 FCC Rcd 11145, 11148, para. 8 (1999) ("It is generally inappropriate to address arguments for a change in rules where third parties, including those with substantial stakes in the outcome, have had no opportunity to participate, and in which we, as a result, have not had the benefit of a full and well-counseled record.") (internal citations omitted)).

[13] *Dismissal Letter* at 2-3.

notice-and-comment rulemakings, were subject to strict eligibility limitations, and intended to preserve existing service that would otherwise have been lost due to regulatory changes.[14]  For these reasons, the Bureau denied the Waiver Request and dismissed the Application for failure to specify a valid FM broadcast radio operating channel.[15]

4.      On April 3, 2025, WHKA filed a petition for reconsideration (Petition)[16] of the *Dismissal Letter*, reiterating that: (1) there are no available FM band channels in its local area;[17] (2) the proposed station would not cause interference to any other broadcast station and satisfies the Commission's rules regarding interference protection for LPFM stations to adjacent FM channels, translator and booster inputs, as well as 'co-channel' Channel 6 TV stations;[18] and (3) the two existing FM operations on the TV6 Band (Class D NCE and LPTV FM6) demonstrate that that spectrum is available for use by FM stations and that an LPFM station should be allowed in the TV6 Band because it is functionally equivalent to a Class D or LPTV FM6 station.[19]

5.      On May 23, 2025, the Bureau denied the Petition for failure to demonstrate a material error in the *Dismissal Letter* or to raise additional facts not known or existing at the time of its last opportunity to present such matters.[20]  The Bureau affirmed that WHKA had failed to present special circumstances justifying waiver of the authorized use of the TV6 Band.  It reiterated that lack of local channel availability is not a special circumstance—many LPFM applicants in densely populated areas could similarly have difficulty locating an available FM frequency.[21]  Although harmful interference in this situation is not defined in the rules (because LPFM stations are not authorized to operate in the TV6 Band), the Bureau found that WHKA's claim of non-interference could be made by other LPFM stations and therefore did not demonstrate special circumstances.[22]  Finally, the Bureau found that the LPFM stations are not technically, functionally, or statutorily equivalent to LPTV FM6 operations or Class D NCE stations, such that the rules or policy considerations applicable to one service should extend by analogy to the other—in fact, such reasoning would effectively eviscerate the distinct regulatory regimes applicable to these different types of FM service.[23]  The Bureau emphasized that when the Commission

---

[14] *Dismissal Letter* at 3 (referring to LPTV FM6 operations and Class D NCE stations).

[15] *Id.*

[16] Pleading File No. 268930.

[17] Petition at 2, 8.

[18] *Id.* at 2, 4, 7.  WHKA also argued that it satisfies the requirements of the *U.S. – Canada Working Arrangement* regarding operation within 250 miles of the Canadian border.  Petition at 5-6 (citing *Working Arrangement for the Allotment and Assignment of FM Broadcasting Channels under the Agreement between the Government of Canada and the Government of the United States of America Relating to the FM Broadcasting Service*, available at https://www.fcc.gov/broadcast-agreements-canada (executed in 1991, amended in 1997) (*U.S. – Canada Working Arrangement*)).

[19] *Id.* at 6-7.  WHKA also argued that its proposed LPFM station was "statutorily equivalent" to the one Class D translator operating on Channel 200, K200AA, Sun Valley, Nevada, which rebroadcasts NCE Class C0 station KAWZ, Twin Falls, Idaho, and therefore must be treated the same.  *Id.* at 6 (citing Local Radio Community Act of 2010 (LCRA), Pub. L. No. 111-371, 124 Stat. 4072 (2011) (providing that LPFM and FM translator stations are both secondary services and are "equal in status")).

[20] *Reconsideration Letter* at 4 (citing 47 CFR § 1.106(c); *WWIZ, Inc.,* Memorandum Opinion and Order, 37 FCC 685, 686 (1964)).

[21] *Reconsideration Letter* at 5.

[22] *Id.* at 5.

[23] *Id.* at 4-5 (noting that, to the extent that WHKA argues that it should be allowed to operate in the TV6 band because there is a single FM translator licensed in that band, LCRA's "equal in status" requirement does not

(continued....)

authorized certain LPTV FM6 operations and Class D NCE operations in the TV6 Band, it placed stringent limits on these uses and expressly rejected the idea of further expansion of FM radio service in this spectrum beyond these limited categories.[24] Moreover, it noted that WHKA's arguments regarding other existing FM radio operations in the TV6 Band apply equally to all LPFM applicants, not just to WHKA, and therefore should form the subject of a rulemaking, not an individual waiver in a licensing proceeding.[25] For these reasons, the Bureau concluded that none of the factors presented by WHKA warranted a waiver of the Commission's core allocation rules.[26]

6.       In the Application for Review, WHKA contends that special circumstances justifying waiver exist whenever "the strict application of a rule would preclude service despite no technical barrier, and where the public interest would be better served."[27] It argues again that the unavailability of an operating channel in its area is a special circumstance warranting waiver, and that by finding otherwise the Bureau "attempt[ed] to diminish the significant technical, logistical, and legal burdens" involved in locating an available frequency.[28] WHKA also likens its difficulty finding an available channel to the "special circumstances" of a Class D NCE station unable to find an operating frequency and thus permitted by section 73.512(a)(2) to operate on Channel 200.[29] It reiterates its claim that its proposed operation would not cause harmful interference to any other broadcast station—either because the proposed station would meet spacing and contour overlap provisions established for other services or frequencies or would be eligible for a waiver of such requirements.[30] Finally, WHKA urges that LPFM stations should be permitted to operate in the TV6 Band because the two authorized FM uses of this band establish that Channels 199 and 200 are "bona fide frequencies in the FM broadcast band" and that FM stations using these frequencies has already been shown to be in the public interest.[31] According to WHKA, LPFM service is functionally equivalent to Class D NCE and LPTV FM6 operations due to: (1)

(Continued from previous page) ————————————————

mandate identical licensing procedures for LPFM and FM translator stations and citing *Foundation for a Beautiful Life, Inc.*, Memorandum Opinion and Order, 36 FCC Rcd 15933, 15945-46, paras. 16-17 (2021)).

[24] *Id.* at 5; *see also Changes In The Rules Relating To Noncommercial Educational FM Broadcast Stations*, Second Report and Order, 69 FCC.2d 240, 259, para. 59 (1978) ("[W] we will use Channel 200 exclusively in the manner described and will limit stations to their present facilities") (*Second Report and Order*); *Fifth LPTV Order*, 38 FCC Rcd at 6988, 7006-7, paras. 24 ("We adopt our proposal to allow only FM6 LPTV stations with 'active' FM6 STAs to continue to provide FM6 service") and 61 (rejecting a plan to allow additional FM radio stations in the TV6 spectrum and stating, "We find that the record does not support such a plan to remove a portion of the remaining spectrum allotted for television use and converting it to radio use. We find that the plan is neither feasible, because of the possibility of interference; nor efficient, because receivers are not capable of receiving FM stations below 87.7 FM; nor appropriate, because TV6 spectrum is still needed for broadcast television use.").

[25] *Reconsideration Letter* at 4-5, n.30.

[26] *Reconsideration Letter* at 5. The Bureau did not reach WHKA's contention that it satisfied the terms of the *U.S. – Canada Working Arrangement*, as it affirmed the dismissal of the Application on other grounds. In the *Dismissal Letter*, the Bureau declined to consider WHKA's request for waivers of sections 73.825 and 74.1205(b) of the rules to allow it to be short-spaced to WVCC-LD, Westmoreland, New Hampshire (WVCC). *See Dismissal Letter* at 1, n.2 (noting that sections 73.825 and 74.1205 do not set out spacing requirements for the requested frequency of 87.7 MHz and therefore there is no applicable spacing requirement to waive).

[27] Application for Review at 9.

[28] *Id.* at 3-4.

[29] Application for Review at 6 (citing 47 CFR § 73.512(a)(2)).

[30] Application for Review at 2, 4; Petition at 4; Application, Attachment entitled WHKA FM 87.7 - Comprehensive Technical Statement.pdf.

[31] Application for Review at 8-9.

technical and operational similarities between all FM services, especially from a listener's standpoint;[32] (2) similar policy goals for the Class D NCE and LPFM services;[33] and (3) the secondary status of both Class D and LPFM services.[34] WHKA argues that, when the Commission authorized Class D NCE stations in 1978, it stated that the approved use of Channel 200 was "for the time being" and therefore left open the possibility of additional future uses.[35] From a policy standpoint, WHKA contends, the Bureau's denial of its Waiver Request frustrated the "core purpose of the LPFM service to expand local, noncommercial voices in communities underserved by other media outlets."[36]

## III. DISCUSSION

7. We deny the Application for Review. An application for review of a final action taken on delegated authority will be granted when, *inter alia*, such action: conflicts with statute, regulation, precedent or established Commission policy; involves a question of law or policy which has not previously been resolved by the Commission; involves application of a precedent or policy that should be overturned; or makes an erroneous finding as to an important or material factual question.[37] The Commission's rules do not permit the grant of an application for review "if it relies on questions of fact or law upon which the designated authority has been afforded no opportunity to pass."[38] Here, we find that the Bureau's actions in the *Reconsideration Letter* were consistent with statute, regulation, precedent, and established Commission policy, as explained below.

8. We agree with the Bureau that the Waiver Request does not meet the standard set out in *WAIT Radio*[39] and subsequent cases. The Commission's rules may be waived for good cause shown.[40] When an applicant seeks waiver of a rule, it must plead with particularity the facts and circumstances which warrant such action.[41] The Commission must give waiver requests "a hard look," but an applicant for waiver "faces a high hurdle even at the starting gate"[42] and must support its waiver request with a compelling showing.[43] Waiver is appropriate only if both (1) special circumstances warrant a deviation from the general rule, and (2) such deviation better serves the public interest.[44] It has long been Commission practice to make decisions that alter fundamental components of broadly applicable regulatory schemes in the context of rulemaking proceedings, not adjudications.[45] Here, WHKA has

---

[32] *Id.* at 5-6.

[33] *Id.* at 6.

[34] *Id.* at 6.

[35] *Id.* at 7.

[36] *Id.* at 5.

[37] 47 CFR § 1.115(b)(2).

[38] 47 CFR § 1.115(c).

[39] *WAIT Radio v. FCC*, 418 F.2d 1153 (D.C. Cir. 1969) (*WAIT Radio*).

[40] 47 CFR § 1.3.

[41] *WAIT Radio*, 418 F.2d at 1157.

[42] *WAIT Radio*, 418 F.2d at 1157.

[43] *Greater Media Radio Co., Inc.*, Memorandum Opinion and Order, 15 FCC Rcd 7090, 7094, para. 9 (1999).

[44] *NetworkIP, LLC v. FCC*, 548 F.3d 116, 125-128 (D.C. Cir. 2008) (citing *Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (1990) (*Northeast Cellular*)).

[45] *Sunburst Media LP and Clear Channel Broadcasting Licenses, Inc.*, Memorandum Opinion and Order, 17 FCC Rcd 1366, 1368, para. 6 (2002); *see also, e.g., Birmingham Christian Radio, Inc. and Radio South Inc.*, Memorandum Opinion and Order, 18 FCC Rcd 7909, 7915, para. 19 (2003) (finding that arguments challenging market definitions are more appropriately addressed in a rulemaking proceeding); *Great Empire Broadcasting, Inc.* 14 FCC Rcd 11145, 11148, para. 8 (1999) (finding that "[i]t is generally inappropriate" to question the validity of

(continued....)

failed to show either special circumstances or that deviation from the Commission's rules in this instance better serves the public interest.

9.      *Channel unavailability.* The "technical, logistical, and legal burdens" that LPFM applicants may encounter when searching for an available channel are common to many applicants and therefore do not constitute special circumstances warranting waiver.[46] As the Bureau noted, "[m]any applicants in densely populated areas could similarly have difficulty locating an available FM frequency."[47] WHKA's situation in this respect is not unique or special.[48] Therefore, this factor does not support grant of the Waiver Request.

10.      *Lack of Interference.* WHKA's claim that its proposed station would not interfere with other FM or TV broadcast stations is likewise not a special circumstance. Various rules limit the potential for interference to the reception of other broadcast signals—most commonly by means of minimum distance separation requirements or signal strength contour overlap prohibitions. There is no specific interference-related rule governing LPFM operation in the TV6 Band because these frequencies are not authorized for LPFM use. Therefore, in order to consider the merits of WHKA's claim of no interference, we would need to assess to what degree its proposed operations are analogous to existent interference rules for other situations and services. We need not engage in this exercise, however, because we agree with the Bureau that regardless of what interference standard may be appropriate in these circumstances, WHKA's proposed station is not distinguishable from other LPFM stations from an interference standpoint. Many LPFM stations, if proposing use in the TV6 Band, could assert that they meet the same spacing or contour overlap requirements. Moreover, we note that with respect to grandfathered LPTV FM6 operations in this band, WHKA does not meet and could never meet the primary requirement imposed to avoid interference, which is that the LPTV FM6 station must already exist and have an "established track record of not causing interference to adjacent channel FM stations or their own television signal."[49] For these reasons, we conclude that WHKA's claim regarding lack of interference is not a special circumstance justifying waiver.

11.      *Existing FM operations in the TV6 Band.* WHKA argues that its proposed LPFM operation is equivalent to the two authorized FM uses of the TV6 Band—grandfathered LPTV FM6 operations and some Class D NCE stations—and that the existence of these authorized uses demonstrates that the TV6 Band generally is prospectively available for use by other FM stations. This argument does not present a special circumstance supporting a waiver request. To the extent that WHKA's proposed station may share policy goals or technical features with LPTV FM6 and Class D NCE services, so do all

(Continued from previous page) ————————————————
Commission rules in a restricted adjudicatory proceeding "'where third parties, including those with substantial stakes in the outcome, have had no opportunity to participate, and in which we, as a result, have not had the benefit of a full and well-counseled record.'") (internal citations omitted); *Community Television of Southern California v. Gottfried*, 459 U.S. 498, 511 (1983) ("[R]ulemaking is generally a 'better, fairer, and more effective' method of implementing a new industry-wide policy than the uneven application of conditions in isolated license renewal proceedings.").

[46] *See* Application for Review at 3-4 (objecting to the application process generally, including the "actual process an LPFM applicant must follow to assess spectrum availability and prepare a compliant application"; the fact that "all applicants are realistically bound to locations which are both considered 'local' and at which they can site their facilities"; and a concern that the Commission does "not provide technical or legal assistance," but instead "recommend[s] that applicants hire 'outside help'").

[47] *Reconsideration Letter* at 5.

[48] *See generally, Northeast Cellular*, 897 F. 2d at 1166-67.

[49] *See Fifth LPTV Order*, 38 FCC Rcd at 6983, para. 13 and 7005, para. 58 (addressing interference concerns by limiting modifications and service areas of LPTV FM6 stations as well as limiting LPTV FM6 stations to "a finite group that have already proven they do not cause the interference that many of the Part 73 technical rules for FM stations are intended to prevent.").

other LPFM stations. Importantly, when the Commission authorized FM use of the TV6 Band, it did so through notice-and-comment rulemakings in which all affected stakeholders, including the multiple stations directly affected by the proposed action, had the opportunity to participate.[50] An individual waiver request is not the proper forum to deliberate whether, generally speaking, LPFM operation in the TV6 Band is comparable to existing uses or would serve the public interest, and we decline to do so here.

12. We reject WHKA's assertion that the FM Band is statutorily or otherwise defined as including 87.7 and 87.9 MHz, and its reliance on the Preventing Illegal Radio Abuse Through Enforcement Act (PIRATE Act), the Table of Frequency Allocation, and the LCRA is misplaced.[51] The PIRATE Act[52] defines what constitutes pirate radio broadcasting, not FM radio broadcasting. The Table of Frequency Allocations allocates 88-108 MHz to broadcasting but does not distinguish between radio and television and therefore is not relevant to determining allocations between the two.[53] Finally, the LCRA does not discuss or define frequencies within the FM Band and therefore is not applicable here.[54] None of these sources ultimately support WHKA's request for a waiver to operate in the TV Band.

13. Regarding WHKA's comparison of the Waiver Request to what it calls the "special circumstances" of allowing a Class D station to operate in the TV6 Band if no regular commercial FM channel is available,[55] we observe that such operation is permitted through a rule of general applicability at section 73.512(a)(2), which applies only to existing Class D NCE stations.[56] This is entirely different from the Waiver Request at issue here, which essentially seeks authorization for a new service in the TV6 Band not provided in the rules based on issues of general applicability. Indeed, the existence of a codified exception to regular Class D channel assignments once again illustrates the point that policy decisions affecting an entire broadcast service are best undertaken as part of a rulemaking proceeding, not a waiver

---

[50] *See Fifth LPTV Order*, 38 FCC Rcd at 6980. While the Bureau granted special temporary authority (STA) to allow certain stations to conduct LPTV FM6 operations, the Bureau's actions, in addition to being temporary, are not binding on the Commission. *Fifth Report and Order*, 38 FCC Rcd at 6978, para. 4. *See Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008) (affirming the "'well-established view that an agency is not bound by the actions of its staff if the agency has not endorsed those actions'") (internal citations omitted).

[51] Application for Review at 4.

[52] 47 USC § 511 (defining "pirate radio broadcasting" to mean "the transmission of communications on spectrum frequencies between 535 and 1705 kilohertz, inclusive, or 87.7 and 108 megahertz, inclusive, without a license by the Commission....").

[53] 47 CFR § 2.106.

[54] *See* LCRA, *supra* note 19.

[55] *See* Application for Review at 6.

[56] *See* 47 CFR § 73.512(a)(2). We find that WHKA's claim that 47 CFR § 73.512(a)(2) incorrectly reflects current relevant treaty requirements is irrelevant to this proceeding, as section 73.512(a)(2) relates to neither LPFM stations nor waiver requests, but rather to Class D noncommercial educational stations, which is a different class of stations than WHKA. Likewise, the Bureau's assignment of FM translator station K200AA to Channel 200 is not relevant here, as K200AA is not an LPFM station, K200AA was not authorized pursuant to a waiver, and no FM translators were subsequently authorized to operate in the TV6 Band. Moreover, this action, which was not accompanied by a letter decision explaining the basis of the decision, has no precedential value and as a staff decision is not binding on the Commission. *See Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008) (affirming the "'well-established view that an agency is not bound by the actions of its staff if the agency has not endorsed those actions'") (internal citations omitted); *Applications for Authority to Construct and Operate Multipoint Distribution Service Stations at Three Transmitter Sites*, Memorandum Opinion and Order on Reconsideration, 10 FCC Rcd 11162, 11175, para. 41 (1995) ("unexplained staff actions are not precedent to be followed"); *United States Cellular Operating Co. Compliance with Section 22.942 of the Commission's Rules in the Rockford, IL MSA*, Order, 15 FCC Rcd 4372, 4378, para. 10 (2000) (grant of application by public notice without explanation did not serve as precedent).

in an individual adjudication.[57]

14.    *Conclusion.* For the foregoing reasons, we deny the Application for Review.

## IV.    ORDERING CLAUSES

15.    IT IS ORDERED that, pursuant to Section 5(c)(5) of the Communications Act of 1934, as amended,[58] and Section 1.115(g) of the Commission's Rules,[59] the Application for Review filed by WHKA FM 87.7 Inc. on June 27, 2025 (Pleading File No. 274386) IS DENIED.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[57] *See supra*, note 41. In this respect, WHKA's reliance on the Commission's statement that "for the time being, we will use Channel 200 exclusively in the manner described" is misplaced. *See* Application for Review at 7 (citing the *Second Report and Order*, 69 FCC.2d at 259, para. 59). The Commission has chosen to expand the use of this frequency range since that time, specifically in the case of adopting rules for LPTV FM6 operations on 87.75 kHz, but only after providing notice and seeking comment in a rulemaking proceeding.

[58] 47 U.S.C. § 155(c)(5).

[59] 47 CFR § 1.115(g).

Storrs-Mansfield, CT 06268

(860) 341-1731

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL**®

7022 1670 0003 4339 0838




MARLBOROUGH
JUN 22, 2026

20001

**$21.57**

S2324E500254-25

RDC 03

Clerk, District of Columbia Circuit
United States Court of Appeals
333 Constitution Avenue Northwest
Washington, DC 20001



JUN 2 4

SCREENED BY
U.S. MARSHALS



PRIORITY MAIL ★

TRACKED
★ ★ ★
INSURED

**UNITED STATES POSTAL SERVICE**®

For Domestic and International Use    Label 107R, May 2014